Filed 7/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NATALIE D., a Minor, etc., | |
| Plaintiff and Appellant, | G047100 |
| v. | (Super. Ct. No. 30-2011-00461082) |
| STATE DEPARTMENT OF HEALTH CARE SERVICES et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, David T. McEachen, Judge. Affirmed.

Pamela Patterson for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Jennifer M. Kim and Carmen D. Snuggs, Deputy Attorneys General Defendants and Repondents

\*          \*          \*

Appellant Natalie D., was born with cerebral palsy and arthrogryposis, a severe congenital orthopedic disorder involving a general stiffness of joints. Since birth, she has been eligible to receive state-funded therapy through California Children's Services (CCS). Natalie's mother (Mother) paid for Natalie to receive physical therapy, including hippotherapy, from private companies. She then applied to CCS to pay for the therapy Natalie was receiving from private companies. CCS refused, but offered to provide Natalie two 30-minute physical therapy sessions a week for six months. An administrative law judge upheld CCS's decision. Mother, as Natalie's guardian ad litem, filed a petition for a writ of administrative mandate in the superior court, naming CCS and the Department of Health Care Services (DHCS) as respondents. The superior court denied the petition. We affirm and conclude hippothereapy is not covered by CCS. Hippotherapy is not a medically necessary treatment as the benefit provided by hippotherapy can be obtained from other treatments received in a gym. We also conclude the services provided by the private companies selected by Mother do not meet the criteria for vendor services and that required services can be provided by CCS.

I

FACTS

We set forth the facts in accordance with the limited scope of review we are charged with performing. Natalie was born in 1998 with cerebral palsy and arthrogryposis, a severe orthopedic condition. Arthrogryposis is a congenital disorder affecting the joints, making them stiff. When Natalie was three weeks old, she started physical therapy with Yvette Gilmour of SKY Pediatric Therapy (SKY). Natalie received physical therapy at SKY twice a week until she was about three years old. At that point, in 2001, Mother arranged for therapy through CCS and entered Natalie into the local school district program, due to limited financial resources.

Natalie was treated conservatively while at CCS because she had a number of events that made her "immediately fragile." In November 2003, Natalie received a

2

gastronomy tube. While being treated during 2003, Natalie was hospitalized in June, August, and October for gastrointestinal issues. She also had severe esophagitis, secondary to a hiatal hernia, in October. That condition caused Natalie to vomit blood. This concerned the therapists and they acted with limited aggressiveness in performing therapy with Natalie. Natalie's hemoglobin counts were "quite low" between December 2005 and February 2006. She had nine blood transfusions during that period and was "not very responsive." She became irritable and grimaced when moved a lot. CCS staff were concerned about placing Natalie upright with her hemoglobin issues. They were also concerned about the possibility of therapy causing bone fractures.

Natalie had other procedures performed in August 2006 and April 2007. She had pneumonia in April 2007, and had additional gastrointestinal issues. She missed "a lot" of school and her teacher modified her activities. Additionally, she had another procedure in June 2009. Therapy had been provided by CCS at the medical therapy unit (MTU) located at Natalie's school. Mother testified that CCS stopped providing regular therapy in 2004 or 2005, and put Natalie on a consult basis, based on its policy of discontinuing therapy when a child fails to make progress.

In July 2009, Mother took Natalie to the J.F. Shea Therapeutic Riding Center (Shea) in San Juan Capistrano. Shea is not a Medi-Cal provider and does not bill Medi-Cal or any insurance companies; it bills the client. Shea provides physical and occupational therapy in an equestrian setting. Hippotherapy is a form of physical therapy; the therapist uses the movement of the horse to provide sensory input and as a tool. The horse's movement helps the client with balance and gait, but Natalie does not work on balance or gait because she is not mobile. In Natalie's case, it appears the therapy was apparently used, in part, to help with her head control. A therapist from Shea testified that the issue of head control could be addressed in many other, non-hippotherapy settings. It could done on an exercise ball or while sitting on mats.

3

Mother took Natalie back to SKY in September 2009. Gilmour worked with Natalie years before and noted there had been a decline in her hip and knee flexion and in her spinal mobility since Gilmour had last seen here. Gilmour said Natalie was no longer able to hold her head in position as she could before, and was "very rigid and very stiff." Since 2009, Natalie has made progress with her hip range of motion, hip and knee flexion and in her head control in a sitting position. She is starting to use her arms while in a seated position.

Mother introduced a video at the administrative hearing showing Natalie during a therapy session at SKY. At one point it showed Natalie on a piece of equipment that appeared to emulate the movement of a horse. Gilmour said the techniques she uses are not novel and the range of motion activities are pretty standard for physical therapists.

Norma Macias, a licensed vocational nurse, has been caring for Natalie since May 2007. When she first started caring for Natalie, Natalie could not sit up and had to be placed in a recliner "in a laying position to keep her head centered and to keep her as comfortable as possible." She could not be placed in a seated position. As of June 2010, it was possible to place Natalie in a seated position and she could hold her head up and watch television.

Dr. Afshin Aminian, Natalie's orthopedist, conducted a follow-up examination of Natalie on November 30, 2009. He noted an improvement in her hip flexion over the last year and that she had "much better truncal control and head control." He attributed the improvement to her treatment at Shea. His report stated he would be "in favor of continuing" her treatment at Shea and SKY.

In late 2009, Mother complained that the therapy Natalie received through CCS for the last five to seven years was ineffectual and therefore Natalie pursued private therapy at SKY. Mother requested that Natalie's therapy be transferred to the private entities she chooses (SKY and Shea). CCS set up a meeting with Mother to resolve the issue. CCS proposed to increase Natalie's therapy treatment frequency for physical and

4

occupational therapy from one 30-minute session once a month to two 30-minutes sessions a week, with a reevaluation after six months. Mother rejected the offer.

Lynn Einarsson Woods, a physical therapist with CCS, is responsible for compliance with state and local regulations and oversees staff operations. She said the therapy gym at the MTU is similar to SKY's gym with one exception, but that the MTU provides support comparable to that supplied by the piece of additional equipment at SKY.

She explained CCS's medical therapy program and said Mother requested that CCS provide its services through SKY and Shea, in lieu of the services at a Medi-Cal certified medical rehabilitation center MTU. CCS denied the request for services provided by SKY because Natalie's needs did not meet the criteria for vendor therapy services. Vendor services can be used if there is no MTU within 30 miles of a patient's residence, there are insufficient therapists at the MTU to provide needed therapy, or the medical therapy program is not equipped to provide specialized modalities. CCS denied the request for hippotherapy and cited Health and Safety Code section 123850 for the proposition that hippotherapy is not a CCS benefit.

Natalie appealed the denial of her requests to the Orange County Health Care Agency. (Cal. Code Regs. tit. 22, §§ 42140, 42160.) When this appeal was denied, she requested a CCS Fair Hearing in accordance with California Code of Regulations, title 22, section 42180, subdivision (a). The Fair Hearing was conducted over a two-day period in June 2010, before an administrative law judge from the State Department of Health Services, Office of Administrative Hearings and Appeals. (Health & Saf. Code, § 20; Cal. Code Regs, tit. 22, § 42180.) The administrative law judge denied the second administrative appeal, finding Natalie failed to establish that hippotherapy is a CCS benefit, and that CCS's denial of her request for hippotherapy was proper. Mother thereafter filed a petition for a writ of administrative mandate in superior court on

Natalie's behalf as her guardian ad litem. The superior court denied relief and upheld the administrative law judge's decision. Natalie appeals.

II

DISCUSSION

A. *Standard of Review*

A court presented with a petition for an administrative writ of mandate reviews whether the administrative agency "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code of Civ. Proc., § 1094.5, subd. (b).) Our review of the superior court's decision is limited. We may only determine whether the superior court's decision is supported by substantial evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824; Code of Civ. Proc., § 1094.5, subd. (c).) In doing so, we must resolve all conflicts in favor of CCS and DHCS, as they prevailed below. (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461.) Thus, we cannot reweigh the evidence. If the judgment is supported by substantial evidence, it must be affirmed. (*Id*. at pp. 1461-1462.) The question is not whether there is substantial evidence that would have supported a contrary judgment, but whether there is substantial evidence supporting the judgment made by the trial court.

B. *Statutory Overview*

Under the Robert W. Crown California Children's Services Act (Health & Saf. Code, § 123800 et seq.; further undesignated statutory references are to this code), the state provides a number of services for physically disabled children. (§ 123805.) The Legislature intended, "through this article to provide, to the extent practicable, for the necessary medical services required by physically handicapped children whose parents are unable to pay for these services, wholly or in part." (§ 123825.) The services provided include physical therapy and occupational therapy. (§ 123840, subds. (e)

6

[physical therapy], (f) [occupational therapy].)  The services are to be provided in a medical therapy program in local public schools.  (§ 123950.)

The services to be provided must be preapproved by the DHCS.  (§ 123929, subd. (a).)  There are three requirements for authorization.  First, the child must qualify for the CCS program.  (§ 123929, subd. (a)(1).)  No one disputes Natalie qualifies for services.  (§ 123830; Cal. Code Regs., tit. 22, § 41517.5, subd. (a)(3).)  Indeed, she has received services since 2001.

Second, the provider of the services must be approved "in accordance with the standards of the CCS program."  (§ 123929, subd. (a)(2).)  To be a provider of services, the entity must be "enrolled in the Medi-Cal program."  (Cal. Code Regs., tit. 22, § 51051, subd. (a).)

Third, the services must be "medically necessary to treat the child's CCS-eligible medical condition."  (§ 123929, subd. (a)(3).)  To be deemed medically necessary, the services must be found to be "required to meet the medical needs of the client's CCS-eligible medical condition as prescribed, ordered, or requested by a CCS physician *and* which are approved within the scope of benefits provided by the CCS program."  (Cal. Code Regs, tit. 22, § 41452, italics added.)  The Medical Therapy Conference determines a client's need for occupational therapy and physical therapy.  The determination of medical necessity is based on the client's physical and functional status.  (Code of Regs., tit. 2, § 60323, subd. (a).)

C.  *Hippotherapy*

CCS properly denied the request to provide Natalie hippotherapy through Shea.  Hippotherapy is not "required to meet" Natalie's medical needs, as mandated by California Code of Regulations, title 22, section 41452.  The uncontroverted evidence demonstrated that the benefits provided by hippotherapy can also be provided by therapy provided in the gym with the use of other non-equine tools, such as an exercise ball, a

7

swing, or a piece of equipment that mimics a horse's movement, such as the one used in the video shown to the administrative judge by Mother.

Dr. Aminian, Natalie's orthorpedist, stated he would be in favor of Natalie continuing to receive treatment at Shea. It is urged that CCS was required to approve hippotherapy based on Dr. Aminian's recommendation. Not so. A CCS physician's prescription, recommendation, or request is but one of two conditions that must be met. The second is that the therapy be "approved within the scope of benefits provided by the CCS program." (Cal. Code Regs., tit. 22, § 41452.) Under this regulation, the child's physician is not the sole arbiter of what is medically necessary. (See *Paleski v. State Dept. of Health Services* (2006) 144 Cal.App.4th 713, 736; *Cowan v. Myers* (1986) 187 Cal.App.3d 968, 976.) The Medical Therapy Conference determines medical necessity for purposes of occupational and physical therapy. (Cal. Code of Regs., tit. 2, § 60323, subd. (a).) Dr. Dan Kouwabunpat is the medical therapy conference doctor who provides medical direction for therapy and determines medical necessity based on a patient's function and rehabilitation potential.

The ultimate decision concerning medical necessity should be made after due consideration is given the physician's request or recommendation, but the statutory scheme is designed to provide free medically necessary treatment to a qualifying child "to the extent *practicable*." (§ 123825, italics added.) Here, where the evidence demonstrates the benefits of the $140 an hour hippotherapy[1] can also be obtained through the use of equipment available at a physical therapy gym,including the piece of equipment used in SKY's gym and which mimics a horse's movement, there is substantial evidence supporting the conclusion that hippotherapy was not medically necessary.

---

[1] Shea charges $105 for a 45-minute session, which translates to $140 an hour.

Moreover, any proposed plan of therapy must "ensure the inclusion *of measurable functional goals and objectives* for services to be performed by occupational therapists and physical therapists, as well as activities that support the goals and objectives to be performed by parents or LEA staff to maintain or prevent loss of function." (Cal. Code of Regs., tit. 2, § 60323, subd. (b), italics added.) We have not been directed to any such goals as a part of the request to have Shea provide hippotherapy.

D. *Physical Therapy at SKY*

CCS declined to cover therapy treatments by SKY because it found the services provided by SKY are available at the MTU and there was no showing of the criteria necessary for approval of vendor services. The notice of action informing Mother of CCS's decision referred to provisions of CCS's Manual of Procedures. In pertinent part, the manual authorizes alternative sources of treatment—sources outside of the MTU—when "[t]here is not an MTU within 30 miles of the child's residence" (CCS Procedures Manual, ch. 4, § 4.4.5A), or "[t]here are insufficient therapists in the MTU to provide therapy." (CCS Procedures Manual, ch. 4, § 4.4.5A.) It is undisputed that there is a MTU within 30 miles of Natalie's residence.

The position urged on Natalie's behalf is not that there are an insufficient number of therapists in the MTU to provide therapy, but that the therapists did not provide Natalie medically necessary treatment and that she greatly deteriorated under the care she received in the MTU. Even were we to assume "insufficient therapists" includes not only the number but also the quality of the therapists, that argument must fail on appeal. We watched the video sample of treatment Natalie received at SKY and it is apparent from the record that she has made progress in the time she was treated there. But there was also evidence that there exists discrepancies in the measurement of hip flexion in Natalie's case because her hips are in abduction so her legs cannot be placed in

9

a "truly neutral position" for measurement purposes, and that her mood affects flexion. Additionally, as Woods testified, CCS previously took a conservative approach with Natalie because prior to Mother taking her to Shea and SKY, Natalie had a number of other health issues that affected her treatment and made her "immediately fragile." Woods said now that Natalie is feeling better, there exists a window of opportunity to increase her treatment frequency, treatment Mother declined. Accordingly, there is substantial evidence in the record that the requirements for vendor services were not met.

## III

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.