Filed  9/9/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AMANDA NORASINGH,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>WILL LIGHTBOURNE, as Director etc.,<br><br>　　　　Defendant and Respondent. | A137967<br><br>(Contra Costa County<br>Super. Ct. No. N11-1247) |

　　　　Amanda Norasingh—a young adult suffering from significant medical and mental disabilities—appeals from the trial court's denial of her petition for writ of administrative mandamus.  Through these writ proceedings, Norasingh seeks reinstatement of protective supervision benefits under the In-Home Supportive Services (IHSS) Program administered by the California Department of Social Services (CDSS).  After hearing, an administrative law judge (ALJ) concluded that Norasingh was no longer eligible for the protective supervision benefits that she had been receiving since 2005.  The trial court subsequently affirmed the decision of the ALJ.  Norasingh contends on appeal that the trial court's order upholding the ALJ's decision was legally flawed and not supported by substantial evidence.  Finding that a persistent misconception regarding the scope of Norasingh's mental impairment has fatally undermined the eligibility determination in this case, we reverse.

1

# I. BACKGROUND

## A.    *Protective Supervision Under the IHSS Program*

"IHSS is a state social welfare program designed to avoid institutionalization of incapacitated persons. It provides supportive services to aged, blind, or disabled persons who cannot perform the services themselves and who cannot safely remain in their homes unless the services are provided to them. The program compensates persons who provide the services to a qualifying incapacitated person." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 931 (*Basden*).) Pursuant to subdivision (b) of section 12300 of the Welfare and Institutions Code,[1] the supportive services available under the IHSS program include "domestic services and services related to domestic services, heavy cleaning, personal care services, accompaniment by a provider when needed during necessary travel to health-related appointments or to alternative resource sites, yard hazard abatement, protective supervision, teaching and demonstration directed at reducing the need for other supportive services, and paramedical services which make it possible for the recipient to establish and maintain an independent living arrangement."

CDSS is responsible for overseeing the IHSS program and has promulgated regulations to assist in its implementation. (See Cal. Dept. Social Services Manual of Policies and Procedures (MPP), §§ 30-700 to 30-785; *Miller v. Woods* (1983) 148 Cal.App.3d 862, 868 (*Miller*).) Administration of the IHSS program, however, falls to county welfare departments, under the supervision of CDSS. (*Miller, supra,* 148 Cal.App.3d at p. 868.) Thus, it is the counties that "process applications for IHSS, determine the individual's eligibility and needs, and authorize services." (*Basden, supra,* 181 Cal.App.4th at p. 934.) Determinations made by the counties with respect to IHSS benefits are reviewable by hearing before CDSS at the recipient's or provider's request. (*Miller, supra,* 148 Cal.App.3d at p. 868.)

At issue in this case is the provision of protective supervision services under the IHSS program. According to CDSS regulation, protective supervision consists of

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

monitoring the behavior of nonself-directing, confused, mentally impaired, or mentally ill recipients in order to safeguard those individuals against injury, hazard, or accident. (See MPP, §§ 30-757.17, 30-757.171.) As such, protective supervision involves "not only the observation of behavior to safeguard the individual against harm, but also the intervention to prevent harm 'when the disabled person engages in potentially dangerous conduct.' " (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 616 (*Calderon*), quoting *Marshall v. McMahon* (1993) 17 Cal.App.4th 1841, 1846 (*Marshall*), italics omitted.) Protective supervision is not available, however, when the need is caused by a "medical condition" and the form of supervision required is "medical." (MPP, § 30-757.172(b); see also *Marshall, supra,* 17 Cal.App.4th at p. 1853 [describing protective supervision as "nonmedical oversight, akin to baby-sitting"].) Nor may it be provided in "anticipation of a medical emergency." (MPP, § 30-757.172(c).) Finally, protective supervision is only warranted if "[a]t the time of the initial assessment *or reassessment*, a need exists for twenty-four-hours-a-day of supervision in order for the recipient to remain at home safely." (MPP, § 30-757.173(a), italics added.)

**B.** *Appellant's History of Protective Supervision*

Norasingh is a young woman in her twenties who suffers from a host of medical and mental health problems, including congenital brain malformation, developmental delay, mental retardation, diabetes, asthma, epileptic seizures, and pseudoseizures. Pseudoseizures are psychological events which superficially resemble epileptic seizures.[2] Norasingh lives at home with her parents and younger sister. In 2009, Norasingh's

---

[2] Norasingh submitted uncontradicted evidence at the administrative hearing in this matter that pseudoseizures (also known as psychogenic or non-epileptic seizures) are psychological rather than medical in origin. Indeed, the current Diagnostic and Statistical Manual of Mental Disorders—DSM-5—includes psychogenic, non-epileptic seizures under "conversion disorder" which is defined as "[o]ne or more symptoms of altered voluntary motor or sensory function" found to be *incompatible with* "recognized neurological or medical conditions." (Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) at pp. 318-319.) In other words, psychogenic seizures are a mental impairment, not a medical condition. Respondent acknowledges as much on appeal.

mother and father also became her limited conservators. Under the terms of the limited conservatorship, Norasingh's parents are entitled to determine her residence and make her medical and educational decisions. The conservatorship also limits Norasingh's rights to marry, enter into contracts, and control her social and sexual relationships.

Norasingh first began receiving IHSS benefits in August 2004.[3] She was initially determined to be eligible for 32.90 IHSS hours, with no benefit for protective supervision. Norasingh's mother is her paid IHSS provider. In September 2004, Norasingh filed a request for hearing, disputing the number of IHSS hours authorized. Specifically, Norasingh's mother requested protective supervision hours because Norasingh was having seizures five times a day. In support of this request, Norasingh's neurologist (Dr. Klingman) submitted a November 2004 letter confirming that Norasingh suffers from "intractable seizures both non-epileptic and epileptic" and that in-home patient services would therefore be beneficial "for safety purposes." After hearing, an administrative law judge concluded that Norasingh should have been assessed for protective supervision and ordered an evaluation, with any benefits awarded retroactive to the date of application.

In February 2005, after further consideration of Norasingh's case, Contra Costa County Employment and Human Services (the County) determined that Norasingh was eligible for protective supervision, largely on the basis of the opinion of Dr. Vivian Igra, one of Norasingh's treating physicians. Specifically, Dr. Igra stated that Norasingh had a "current and past history of wandering (if not supervised)" as reported by both her mother and her school. According to Dr. Igra, Norasingh "wanders because she has poor judg[]ment where to go or not to go." Further, Dr. Igra opined that "this poor judgment is

---

[3] "IHSS is actually provided under three programs: the original IHSS program (the residual program) (§ 12300 et seq.); the Medi-Cal personal care services program (PCSP) (§ 14132.95); and the IHSS Plus waiver program (§ 14132.951). The latter two programs tap into federal funds, and IHSS recipients will receive services under the residual program only if they do not qualify under the other two programs. (§§ 12300, subd. (g), 14132.95, subd. (b), 14132.951, subd. (d).)." (*Basden, supra,* 181 Cal.App.4th at p. 933, fn. 4.) According to the ALJ, Norasingh receives IHSS through PCSP.

4

directly cause[d] by her cognitive deficit from her congenital malformation in her brain." Finally, Dr. Igra reported that Norasingh had "many" seizures (both pseudoseizures and physical seizures) and that she was currently in therapy to "treat the cause of why she has the pseudoseizures." The county public health nurse concluded that Norasingh was eligible for protective supervision "because of her self-endangering behaviors stemming from her cognitive deficit," but was not eligible because of her pseudoseizures or physical seizures. As a result of this change in position, Norasingh was granted 195 IHSS hours as "non-severely impaired." In August 2007, Norasingh was reassessed and her protective supervision services were continued. Effective October 2008, Norasingh's IHSS hours were increased to 226.70 when (without explanation in the record) her protective supervision status was changed to severely impaired. In March 2010, her IHSS hours were further increased to 233.10 after it was determined that Norasingh was "still at risk" and required protective supervision for "safety."

On March 17, 2010, Norasingh's neurologist, Dr. Austin, submitted a Physician's Evaluation stating that Norasingh was "mildly confused" and could ambulate and transfer alone. However, she was in need of assistance for some personal care and domestic services. Dr. Austin—who reported seeing Norasingh every three to six months and knowing her for approximately ten years—listed her current diagnoses as diabetes, obesity, medically refractory complex partial seizures, non-epileptic seizures, and developmental delay. In his opinion, Norasingh required assistance to stay in her home and was at risk of permanent out of home placement without IHSS. In particular, he stated that the seizures and developmental delay were the main reasons for the needed care and supervision.[4]

Then, on January 28, 2011, a County social worker, newly assigned to Norasingh's case, conducted an in-home visit to reassess Norasingh's eligibility for IHSS

_____

[4] The administrative record also contains an Assessment of Need for Protective Supervision For In-Home Supportive Services Program which was completed by Dr. Austin on that same date. A standard CDSS form commonly known as a SOC 821, the assessment indicated that Norasingh had moderate issues with memory and orientation and mildly impaired judgment, with related problems of "falling, wandering."

services, including protective supervision.  With respect to the pseudoseizures, the social worker's notes from the home visit indicated that seizures will happen about every two hours when Norasingh is tired and that, as a result, she can collapse and vomit.  Further, the social worker reported that during a major seizure Norasingh can freeze and drop to the ground.  These major seizures—which can be brought on by "[a]ny small activities"—occur two or three times a week for two to four minutes and were the cause of a fractured elbow.  The social worker's notes further described Norasingh as developmentally at about a third grade level.  They also indicated that, during the visit, Norasingh was able to take the dog to the backyard to use the bathroom without her mother accompanying her, although she was never out of sight.  In addition, while the social worker was present, Norasingh had a pseudoseizure for several seconds with "no noticeable changes" occurring afterwards.

With respect to protective supervision, the social worker's notes state as follows: "[Social Worker] has to remove [Protective Supervision] because [client's] mother was not able to report any risky behavior due to client's cognitive impairment.  [Social Worker] spent at least 10 mins trying to figure out if there were any actions that would warrant [Protective Supervision].  [Client's] mother stated that [client] is aware of where she is.  However, when she has her pseudoseizures, she gets fearful and can walk out of the home then not know how to return home.  However she stated that this occurs ONLY when [client] has a pseudoseizure."  Moreover, the social worker found Norasingh to be "very aware" of her surroundings and able to participate during the interview.  She was impressed that Norasingh was able to anticipate her dog's needs and take care of them on her own.  And, relying on Dr. Austin's March 2010 SOC 821, the social worker determined that Norasingh was only "mildly impaired with 'falling, wandering.' "  Based on all of these factors, the social worker concluded:  "It appears that [client's] need for [Protective Supervision] is more for[/]related to her medical condition and in anticipation of a medical emergency.  Since these are not allowable reasons, [Protective Supervision] must be removed at this time."  As a result, Norasingh's IHSS hours were reduced from 233.10 to 56.80 effective April 1, 2011.  Unsurprisingly, Norasingh disagreed with the

6

characterization of her condition and the elimination of her protective supervision benefits. On February 23, 2011, she requested a hearing before CDSS.

**C.**     *The Administrative Hearing*

The sole issue at the June 8, 2011, administrative hearing was the denial of protective supervision for Norasingh. After detailing the history summarized above, the County argued that the social worker had properly assessed Norasingh "based on the medical evidence, observation at the home visit and discussion with the claimant's mother." Although the County admitted that Norasingh has medical and psychological conditions "which impact her ability to perform activities of daily living" and that such conditions "rise to a level of such concern that she is at risk of out-of-home placement without assistance," it maintained that protective supervision was not warranted. Specifically, adopting the position of the social worker, the County stated: "Protective supervision was not granted for pseudo-seizures or epileptic seizures but for self-endangering behaviors stemming from her cognitive deficit." Since Norasingh's mother had not reported any risky behavior due to her daughter's cognitive impairment, any request for protective supervision was "more related to the claimant's medical condition and in anticipation of a medical emergency" and should therefore be denied. At the hearing, the social worker reiterated that Norasingh's wandering was the result of her seizure activity and was therefore related to a medical condition. She also noted that Norasingh's day program had three-to-one staffing, an indication that constant one-on-one supervision might not be necessary.

In response, Norasingh presented significant additional evidence supporting her position that protective supervision services were warranted. Norasingh's mother indicated that her daughter had been given one-on-one supervision while in school. However, she had been unable to find a one-on-one adult program. As a result, Norasingh's mother reported that, at times, Norasingh could not attend her current program at the CAP Center because she had too many seizures and they lacked staff. Indeed, Norasingh's mother reported that her daughter had fallen at least five times in the last year at the CAP Center due to her uncontrolled seizures, one time fracturing her

wrist. Previous injuries from falling included a broken ankle, broken tooth, and cut on the head. According to Norasingh's mother, the danger from her daughter falling was exacerbated by her weight of 206 pounds. She requested protective supervision for Norasingh to safeguard her from injury due to "uncontrolled seizures and mentally impaired such confused and fear, fainting and walk away from us or from a group with out conscious to another area of the house or out side of the house, she also try to open the car door while driving." Similarly, in her January 2011 Provider Service Report, Norasingh's mother indicated that her daughter "walk[s] away to wherever she wants to go." At the administrative hearing, Norasingh's mother testified that she never leaves her daughter alone "[b]ecause she can't fend for her ok to be alone I know that I can't imagine (inaudible) and she can walk out from home she can burn herself and she can (inaudible) that she cannot leave home she might forget." She agreed that her daughter would not know what might cause her danger.

In addition, Norasingh submitted a March 2011 letter from Dr. Austin, the neurologist who had treated her for over ten years, which stated that Norasingh "has uncontrolled seizures and needs protective 24 hour supervision 7 days a week so that she will not injure herself." The record also includes a May 2011 Mental Impairment Questionnaire completed by Dr. Austin with respect to Norasingh. In the Questionnaire, Dr. Austin opined that Norasingh was "unable to exercise good judgment." As signs of mental impairment, Dr. Austin identified: difficulty thinking or concentrating; psychological or behavioral abnormalities associated with a dysfunction of the brain; disorientation as to time and place; perceptual or thinking disturbances; illogical thinking; easy distractibility; and memory impairment. Dr. Austin concluded that Norasingh has "severe" problems in memory, judgment, and insight and requires supervision to prevent her from placing herself in a potentially dangerous situation, such as wandering.

In a document dated February 2011, Dr. Shah reiterated Norasingh's many diagnoses, including pseudoseizures and developmental delay/mental retardation, and stated: "Due to the above diagnoses Amanda is impaired and unable to care for herself without protective supervision 24 hours per day. She has pseudoseizures daily and has

8

epileptic convulsive seizures [] several times per week.  Please continue IHSS services for her."  Dr. Shah also submitted a SOC 821 dated March 31, 2011, which indicated that he had been treating Norasingh since 2007 and concluded that she was moderately impaired with respect to memory, orientation, and judgment.  Specifically, Dr. Shah opined that "[a]t times of pseudoseizures she does not have her full mental capacity."  Similarly, Dr. Shah reported that Norasingh is disoriented and confused in the aftermath of her seizures and pseudoseizures.  Moreover, with respect to judgment, Dr. Shah found "mild to moderate impairment due to mental retardation."  Injuries reported due to Norasingh's mental deficits included "[s]lipped on puddle on floor; walks away/wanders."  Dr. Shah additionally commented that Norasingh "[h]as been known to walk away, open the front door for no reason, open car door while in motion, not understand why water faucet gets hot [and] burns, etc."

Finally, Dr. Olowin, a psychiatrist, completed a SOC 821 dated April 4, 2011, listing Norasingh's diagnoses as mental retardation and psychogenic seizure.  Dr. Olowin found Norasingh to be moderately impaired in both memory and orientation, but severely impaired in judgment.  With respect to judgment, Dr. Olowin noted specifically that Norasingh "wanders into potential danger when experiencing a psychogenic seizure, or drop[s] to the floor."  Injuries caused by Norasingh's mental impairments included the fracture of her arm on July 7, 2010.  Finally, Dr. Olowin concluded that "[w]ithout constant supervision Amanda is in danger of accident or injury."  In a letter dated April 27, 2011, Dr. Olowin reiterated that Norasingh is not capable of being left alone for a significant period of time.  Rather, Dr. Olowin "determined that her impulse control, insight, and judgment are poor, thus she could expose herself to harm without the supervision of others."

After considering all of the evidence, the ALJ concluded—in a July 13, 2011, decision—that Norasingh "does not require 24-hour supervision to protect her from injury, hazards or accidents because of her mental impairment."  The basis for this determination was the ALJ's observation that there was no current evidence presented regarding Norasingh's propensity to wander.  Rather, according to the ALJ, the only

9

evidence of wandering was a "March 17, 2011," evaluation in which the doctor indicated he was aware of "past injuries or accidents related to wandering."[5]  Finally, the ALJ opined:  "Although the recipient has seizures, these seizures are part of her medical condition and to allow protective supervision to monitor her seizure activity would be to allow protective supervision in anticipation of a medical emergency."  Subsequently, on July 21, 2011, CDSS adopted the ALJ decision.

**D.**     *The Petition for Writ of Mandate*

On August 9, 2011, Norasingh filed a petition for writ of mandate in superior court, challenging the ALJ's decision and seeking to compel CDSS to provide protective supervision services.  In particular, she argued that the ALJ's decision was contrary to CDSS regulation, against the advice of her treating physicians, and otherwise unsupported by the evidence.  She also claimed that the ALJ had improperly shifted the burden of proof from the County (to support its termination of protective supervision) to Norasingh (to prove her continued need for such services).[6]  Finally, Norasingh asserted that the ALJ improperly found her psychogenic seizures to be a medical condition for which protective supervision is unavailable.  For its part, CDSS maintained that the ALJ's decision was supported by the weight of the evidence and that Norasingh could not overcome the "strong presumption of correctness" to which this administrative decision was entitled.  Specifically, CDSS averred that there was no current evidence of risky behavior.  Further, although it conceded that Norasingh's pseudoseizures "appear to be

---

[5] Presumably, the ALJ was referring to Dr. Austin's report dated March 17, 2010, although this was not the most current evaluation, nor was it the only evidence of wandering presented.

[6] We see no merit in this contention.  As the trial court pointed out, the County never contested the fact that, pursuant to CDSS regulations, it had "the burden of going forward in the hearing to support its determination."  (MPP, §§ 22-073.3, 22-073.36.)  The County presented a summary of Norasingh's IHSS history, including medical opinions and the social worker's assessment, to meet this burden.  Norasingh was then free to attempt to rebut the evidence presented and to argue that it was insufficient to meet the County's burden, both of which she did.  The fact that the ALJ ultimately disagreed with her did not mean that the initial burden of proof was improperly shifted away from the County.

10

psychological in origin," CDSS argued that there was insufficient evidence that Norasingh was prone to engaging in self-endangering behavior because of her pseudoseizures. At the hearing on November 27, 2012, Norasingh's attorney argued that there was no recent evidence of actual dangerous behavior by Norasingh precisely because she had been under protective supervision, which "encompasses not just watching the individual, but constantly redirecting them from doing any type of dangerous behavior or activity." CDSS, in contrast, countered that there was no evidence during the relevant timeframe that Norasingh "even had a penchant to wander, that she even had a proclivity to engage in the self-endangering activity."

On December 28, 2012, the trial court issued its order denying appellant's petition for a writ of administrative mandamus, holding that the ALJ's determination was supported by the weight of the evidence. Preliminarily, the trial court determined that—given the County's obligation to reassess Norasingh's need for benefits on an annual basis—the only question before the court was whether to affirm the social worker's 2011 assessment. The court then concluded that the ALJ properly gave "substantial weight" to the opinion of the social worker in this case, because Norasingh had not offered any evidence that the social worker was biased, unqualified, failed to spend adequate time on her assessment of Norasingh, or failed to apply the correct criteria in making her assessment. In contrast, the trial court found the many medical opinions offered by Norasingh's treating physicians to be of "limited evidentiary value," both because the doctors had not observed Norasingh in her home setting and because the court deemed their opinions conclusory. With respect to potentially self-endangering behaviors, the trial court noted that the medical opinions "would appear to be based on second-hand information rather than personal observation." Thus, their persuasiveness was "substantially" diminished. Finally, the trial court found probative the fact that Norasingh was "apparently unable to offer even a single *specific* example of self-endangering behavior occurring in 2010 or 2011." The court therefore denied Norasingh's petition. Notice of entry of judgment was served on January 16, 2013, and this timely appeal followed.

11

## II. DISCUSSION

### A.    *Standard of Review*

Judicial review of a denial of Medi-Cal benefits is governed by the administrative mandate process set forth in section 1094.5 of the Code of Civil Procedure.[7] (*Ruth v. Kizer* (1992) 8 Cal.App.4th 380, 385 (*Ruth*); see also § 10962.)  "In reviewing decisions denying applications for public assistance such as Medi-Cal benefits, the superior court exercises its independent judgment, i.e., it reconsiders the evidence presented at the administrative hearing and makes its own independent findings of fact."  (*Ruth, supra,* 8 Cal.App.4th at p. 385; see also *Frink v. Prod* (1982) 31 Cal.3d 166, 174-180 [independent judgment applied in cases involving fundamental vested rights, including the denial of welfare benefits].)  In doing so, however, the court " 'must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' "  (*LaGrone v. City of Oakland*  (2011) 202 Cal.App.4th 932, 940 (*LaGrone*).)

Put another way, while the presumption of correctness is "the starting point for the trial court's review," as a presumption it is rebuttable and may be overcome by the evidence.  (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077 (*Breslin*).)  Thus, when applying the independent judgment test, the trial court may reweigh the evidence and substitute its own findings for those of the agency, after first giving "due respect" to the agency's findings.  (*Ibid.*)  In the end, when ruling on an application for a writ of mandate, "the trial court uses its independent judgment to determine whether the weight of the evidence supports the administrative decision."  (*LaGrone, supra,* 202 Cal.App.4th at p. 940; see also Code Civ. Proc., § 1094.5, subd. (c)

---

[7] Pursuant to Code of Civil Procedure section 1094.5, subdivision (b), "the inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

12

["in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence"].)

On appeal from a decision of a trial court applying its independent judgment, we review the trial court's findings rather than those of the administrative agency. (*Calderon, supra,* 45 Cal.App.4th at p. 612.) Specifically, we review the trial court's factual findings for substantial evidence. In doing so, we must resolve all conflicts in favor of CDSS, the party prevailing below. Further, we cannot reweigh the evidence. Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court. (*Natalie D. v. State Dept. of Health Care Services* (2013) 217 Cal.App.4th 1449, 1455; see also *LaGrone, supra,* 202 Cal.App.4th at p. 940.) In sum, "[t]he question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [agency's] findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable." (*Breslin, supra,* 146 Cal.App.4th at p. 1078.)

With respect to issues of law, in contrast, our review is de novo. (*Breslin, supra,* 146 Cal.App.4th at p. 1077; *Ruth, supra,* 8 Cal.App.4th at p. 385.) In this regard, we acknowledge that an administrative agency's interpretation of its governing regulations— such as CDSS's interpretation of the regulations governing the IHSS program in this case—is entitled to "great weight and deference." (*Calderon, supra,* 45 Cal.App.4th at pp. 612-613.) It is not, however, dispositive. (*Motion Picture Studio Teachers & Welfare Workers v. Millan* (1996) 51 Cal.App.4th 1190, 1195 [deference does not permit an agency to disregard a regulation's plain language].) Further, " ' "[w]hen the facts do not conflict and the issues involve proper application of a statute or administrative regulation, a reviewing court is not bound by the trial court's determination." ' " (*Calderon, supra,* 45 Cal.App.4th at p. 612; see also *Breslin, supra,* 146 Cal.App.4th at p. 1078, fn. 14 ["[s]ubstantial evidence review in an administrative mandamus case

13

includes within it the duty to determine whether the administrative body committed errors of law in applying the facts before it"].)

Applying these standards to the present case leads us to the inescapable conclusion that reversible error has occurred.

## B.  *Application of the Evidence to IHSS Regulations*

As stated above, "protective supervision is available for those IHSS beneficiaries who are non-self-directing, in that they are unaware of their physical or mental condition and, therefore, cannot protect themselves from injury, *and* who would most likely engage in potentially dangerous activities." (*Calderon, supra,* 45 Cal.App.4th at p. 616.)  Prior cases analyzing the availability of protective supervision have listed examples of " 'potentially dangerous' " conduct for which supervision may be authorized, including playing with matches; immersing electrical appliances in water; wandering away from home; cooking; smoking a cigarette; and engaging in self-destructive behavior such as temper tantrums and head-banging against a wall. (*Ibid.*)  However, pursuant to CDSS regulation, protective supervision is only available "for observing the behavior of nonself-directing, confused, mentally impaired, or mentally ill persons." (MPP, § 30-757.171.)  Thus, it cannot be authorized "[w]hen the need is caused by a medical condition and the form of the supervision required is medical." (MPP, § 30-757.172(b).)  And, it is unavailable "[i]n anticipation of a medical emergency." (MPP, § 30-757.172(c).)

In the present case, protective supervision was initially granted to Norasingh based on wandering behavior due to her cognitive deficit.  This fact alone, however, does not control our resolution of this matter.  Rather, protective supervision is available if "[a]t the time of the initial assessment *or reassessment*, a need exists for twenty-four-hours-a-day of supervision in order for the recipient to remain at home safely." (MPP, § 30-757.173(a), italics added.)  And, in fact, eligibility for IHSS benefits must generally be reassessed on an annual basis. (MPP §§ 30-761.13, 30-761.212.)  Thus, the only issue before us (as the trial court correctly found) is whether, at the time of the 2011 reassessment, *any* basis existed for determining that Norasingh was likely to engage in

14

potentially dangerous conduct due to nonself-direction, confusion or mental impairment. (MMP §§ 30-757.17, 30-757.171; *Calderon, supra,* 45 Cal.App.4th at p. 616.) Of course, evidence of past benefits is relevant to this inquiry, but it is current eligibility and need that is dispositive.

Here, the assessing social worker removed Norasingh's protective supervision benefit after her 2011 reassessment because she claimed that Norasingh's mother was unable to identify any current, risky behavior caused by Norasingh's cognitive impairment. Similarly, the ALJ determined that there was no current evidence presented regarding Norasingh's propensity to wander, the original basis for Norasingh's receipt of protective supervision benefits in 2005.[8] Finally, the trial court also concluded that protective supervision was inappropriate because Norasingh was reportedly "unable to offer even a single *specific* example of self-endangering behavior occurring in 2010 and 2011."

In fact, however, there was significant evidence in the record that, as a result of her psychogenic seizures, Norasingh has repeated periods where she is nonself-directing and that, during these timeframes, she is unable to protect herself from injury and is likely to engage in potentially risky behavior. By the social worker's own report generated in connection with her January 2011 home visit, Norasingh has pseudoseizures approximately every two hours when she is tired from which she can collapse and vomit. Further, the social worker reported that during major seizures—which can be brought on by "[a]ny small activities" and occur two or three times a week—Norasingh can freeze and drop to the ground, involuntary behavior that has caused injury, including a fractured elbow. In addition, the social worker acknowledged that when Norasingh "has her pseudoseizures, she gets fearful and can walk out of the home then not know how to return home." Although it is true that no specific timeframe was ascribed to this

---

[8] In the instant case, the ALJ concluded, in essence, that Norasingh's level of need had changed. Thus, we need not reach Norasingh's argument that CDSS's previous authorization of protective supervision benefits created some kind of blanket presumption that such benefits must continue absent proof of changed circumstances.

15

inclination to wander, since the information was elicited at the January 2011 home visit in response to the social worker's request for reports of risky behavior to support the continuation of protective supervision, it is reasonable to assume that it was current. Indeed, the social worker did not reject the information as untimely, but rather discounted it because it related to Norasingh's "medical condition."

Additionally, Norasingh's mother reported that her daughter had fallen at least five times in the last year at her day program due to her seizures, one time fracturing her wrist. Previous injuries from falling at the program included a broken ankle, broken tooth, and cut on the head.[9] The record does not clearly establish that all of these falls stemmed from Norasingh's psychogenic seizures, rather than her epileptic seizures. However, given the fact that she has psychogenic seizures every two hours and epileptic seizures only twice a week, it seems likely that at least some of the falls are attributable to her psychological condition. Further, Dr. Olowin, a psychiatrist, reported that Norasingh falls (and broke her arm in July 2010) as a result of her psychogenic seizures. Norasingh's mother also described Norasingh's mental impairment, including confusion, fear, fainting, walking away, and trying to open the car door while driving. She testified at the administrative hearing that she never leaves her daughter alone because she would not know what might cause her danger. Rather, if left alone, Norasingh might walk away from home and not know how to return or might burn herself.

Finally, current statements by Norasingh's treating physicians support her need for protective supervision based on her psychogenic seizures. For instance, a March 2011 letter from Dr. Austin, a neurologist who had treated Norasingh for over ten years, stated that Norasingh "has uncontrolled seizures and needs protective 24 hour supervision 7

---

[9] The social worker argued at the administrative hearing that one-on-one supervision might not be needed for Norasingh as she goes to a day program where there is only three-on-one supervision. According to Norasingh's mother, she has been unable to find a one-on-one adult program. However, given the number of injuries sustained by Norasingh while at the program and the fact that she is, at times, unable to attend because she is having too many seizures and the program lacks staff, this situation would seem, if anything, to be a strong indicator that more intensive supervision is required.

days a week so that she will not injure herself." In addition, Dr. Austin completed a detailed Mental Impairment Questionnaire in May 2011 regarding Norasingh in which he concluded that Norasingh has "severe" problems in memory, judgment, and insight and requires supervision to prevent her from placing herself in a potentially dangerous situation, such as wandering. Further, Dr. Shah submitted a SOC 821 dated March 31, 2011, which indicated that he had been treating Norasingh since 2007 and concluded that she was moderately impaired with respect to memory, orientation, and judgment. Specifically, Dr. Shah opined that "[a]t times of pseudoseizures, she does not have her full mental capacity" and that she is disoriented and confused in the aftermath of her seizures and pseudoseizures. Injuries reported due to Norasingh's mental deficits included "[s]lipped on puddle on floor; walks away/wanders." Finally, in her SOC 821 dated April 2011, Dr. Olowin, a psychiatrist, found Norasingh to be severely impaired in judgment, stating specifically that Norasingh "wanders into potential danger when experiencing a psychogenic seizure, or drop[s] to the floor." According to Dr. Olowin, Norasingh broke her arm in July 2010 as a result of her mental impairment and "[w]ithout constant supervision [Norasingh] is in danger of accident or injury."

Norasingh complains that the trial court impermissibly discounted the opinions of her treating physicians, finding that the opinion of the social worker assigned to assess her took precedence over all other evidence. In reality, the trial court found the social worker's assessment to have "substantial weight" after determining that it had several indicia of reliability. In contrast, the trial court concluded that the medical opinions offered by Norasingh were of "limited evidentiary value" for several stated reasons. Although Norasingh may not agree with the outcome, the trial court was entitled to weigh the evidence and determine its relative value. (See *Breslin*, *supra*, 146 Cal.App.4th at p. 1077.) Further, the trial court's process mirrored that required of the County when assessing the need for protective supervision. Under CDSS regulation, protective supervision is only available "as determined by social service staff." (MPP, § 30-757.173.) Further, any medical opinions submitted via a SOC 821 "shall be used in conjunction with other pertinent information, such as an interview or report by the social

17

service staff or a Public Health Nurse, to assess the person's need for Protective Supervision." (MPP, § 30-757.173(a)(2); see also § 12301.21, subd. (b).) Finally, the SOC 821 "shall not be determinative, but considered as one indicator of the need for Protective Supervision." (MPP, § 30-757.173(a)(3); see also § 12310.21, subd. (b).) In sum, the trial court did not give "precedence" to the social worker's report (which would be inappropriate under the above-cited CDSS regulations), but instead considered "all of the evidence" and found the social worker's opinion, in this particular case, to be the more credible.

Nevertheless, we conclude that error has occurred. The parties agree that Norasingh has psychogenic seizures and that these seizures "appear to be" psychological in nature. However, we are convinced from our review of the record that both the social worker who assessed Norasingh and the ALJ who reviewed that assessment were operating under the misapprehension that Norasingh's psychogenic seizures were a medical condition and therefore any dangerous behaviors related to those seizures could not be considered for purposes of qualifying Norasingh for protective supervision. The social worker, for instance, although she acknowledged that Norasingh can get fearful, walk out of the home, and not know how to return, indicated that "this occurs ONLY when" Norasingh has a pseudoseizure. As a result, the social worker determined that Norasingh's need for protective supervision related to her *medical* condition and was in anticipation of a *medical* emergency. When asked at the administrative hearing whether she understood that psychogenic seizures are actually a mental illness and not a physical issue, the social worker testified: "I was reading up on that (inaudible) . . . ." Similarly, in denying Norasingh's application for protective supervision, the ALJ expressly stated: "Although the recipient has seizures, these seizures are part of her medical condition and to allow protective supervision to monitor her seizure activity would be to allow protective supervision in anticipation of a medical emergency."

It is true that, in its decision denying Norasingh's writ of administrative mandate, the trial court made no findings regarding the character of Norasingh's psychogenic seizures, despite the uncontroverted evidence presented that they were psychological in

18

origin. However, even discounting the opinions of Norasingh's treating physicians as the trial court did, it is difficult to square the court's conclusion that Norasingh did not offer "even a single *specific* example of self-endangering behavior occurring in 2010 and 2011" with the evidence of falling and injury in the record, unless Norasingh's psychogenic seizures were deemed by the trial court to be a non-qualifying medical condition. Indeed, the trial court indicated that it's decision rested on the general consideration that protective supervision is "not authorized to protect a person from medical risks." Finally, it opined that no evidence was presented "showing that the social worker failed to apply the correct criteria in making her assessment," a statement which could only be true if the trial court agreed with the social worker that Norasingh's pyschogenic seizures constituted a medical condition.

In sum, a persistent misunderstanding regarding the nature of Norasingh's psychogenic seizures fatally infected the entire assessment process and cannot be squared with the plain language of CDSS regulations authorizing protective supervision except in cases where "the need is caused by a medical condition and the form of the supervision required is medical." (MPP § 30-757.172(b).) In fact, the need caused by Norasingh's psychogenic seizures is not caused by a medical condition. In addition, medical supervision does not seem to be required to protect her from wandering or sustaining injury due to falls. Rather, what is needed is a type of "non-medical oversight, akin to baby-sitting." (*Marshall, supra,* 17 Cal.App.4th at p. 1853.) We note in this regard that MPP section 30-757.172(b) is written in the conjunctive. Thus, evidence on either of these points should be sufficient to remove Norasingh from the purview of the "medical" exception to protective supervision. Indeed, it seems that Norasingh's nonself-directing, confused behavior in the wake of her *epileptic* seizures as described by Dr. Shah should also be considered when determining her eligibility for protective supervision, so long as any supervision required is not "medical." (See *Marshall, supra,* 17 Cal.App.4th at p. 1853 [nonself-directing behavior due to a physical ailment may support eligibility for protective supervision].) For similar reasons, supervision to redirect Norasingh from wandering and/or falling as a result of her psychogenic (or epileptic) seizures does not

19

appear to be "[i]n anticipation of a medical emergency." (MPP § 30-757.172(c).) Wandering away from home has been expressly recognized as the type of potentially dangerous conduct for which protective supervision is appropriate. (*Calderon, supra,* 45 Cal.App.4th at p. 616.) Moreover, we perceive no distinction between falling as the result of nonself-direction and head-banging, another type of self-destructive conduct for which protective supervision has been endorsed. (*Ibid.*)

Given the pervasiveness of the problem, we cannot, on this record, definitively determine whether Norasingh is actually entitled to protective supervision due to risky behaviors associated with her psychogenic seizures. For instance, because Norasingh's psychogenic seizures were viewed as interchangeable with her epileptic seizures for protective supervision purposes, the two were often discussed together, making it difficult to distinguish between the behaviors caused by each. Further, given the social worker's disinterest in behaviors related to Norasingh's psychogenic seizures, the timing of those behaviors was not sufficiently explored in the 2011 assessment. Norasingh is therefore entitled to a new assessment which properly considers behaviors related to her psychogenic seizures as a potential basis for protective supervision, along with all other relevant evidence. As part of this new assessment, Norasingh should provide any available evidence of a current propensity for engaging in self-endangering behavior during periods of nonself-direction or as a result of a mental impairment such as her psychogenic seizures.

As a final matter, we note our disagreement with Norasingh's contention that she is required to actually engage in dangerous activity in order to remain eligible for protective supervision. As CDSS properly points out, what is required is evidence of a *propensity* for engaging in self-endangering behavior as a result of her mental impairment. Thus, while evidence of falling and related injury due to her psychogenic seizures would certainly be probative of a need for protective supervision, so too would evidence of the number of times that Norasingh's mother has stopped her from falling. Similarly, evidence of actual wandering related to her psychogenic seizures or other mental impairments would clearly support provision of protective supervision, but so too

20

would evidence of the many times Norasingh's mother (or another caretaker) is required to redirect Norasingh away from the front door, the stove, the hot water faucet or any other potentially dangerous situations. A simple log indicating the date and the nature of the incident would be useful evidence. In addition, well-supported medical opinion that—because of her nonself-direction, cognitive deficit or other mental impairment—Norasingh lacks the judgment to protect herself from harm (either generally or during her persistent seizures) would also be relevant.

### III. DISPOSITION

The judgment is reversed and the case is remanded to the trial court with instructions to issue a peremptory writ of mandate compelling CDSS to set aside its decision denying Norasingh eligibility for protective supervision benefits and to reconsider its eligibility determination in light of this decision. Appellant is entitled to her costs on appeal.

_____
REARDON, J.

We concur:


_____
RUVOLO, P.J.


_____
RIVERA, J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Judith S. Craddick |
| Counsel for Plaintiff and Appellant: | Katherine Siegfried<br>Bob Capistrano<br>Kari Rudd<br>Bay Area Legal Aid |
| Counsel for Respondents: | Kamala D. Harris<br>Attorney General of California<br>Julie Weng-Gutierrez<br>Senior Assistant Attorney General<br>Susan M. Carson<br>Supervising Deputy Attorney General<br>Nimrod P. Elias<br>Deputy Attorney General |