Filed 4/2/15  Sisneros v. SF Municipal Transp. Agency CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| ANDREW SISNEROS,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY, et al.,<br><br>     Defendants and Respondents. | A139360<br><br>(San Francisco County<br>Super. Ct. No. CPF 11-511611) |

     Andrew Sisneros (Sisneros) was a bus driver for San Francisco Municipal Transportation Agency (SFMTA) until he was terminated from employment for dishonesty in connection with an investigation into tampering with an on-board "Drive-Cam" video system on an SFMTA bus.  Sisneros challenged the decision by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5.[1]  After a hearing, the trial judge denied the petition in a five-page written order.  For the reasons set forth below, we find that substantial evidence does not support the trial judge's denial and we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

     Sisneros was a bus driver for SFMTA from March 2002 until his employment was terminated on July 20, 2011.  The terms and conditions of his employment were governed

---

     [1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

1

by a memorandum of understanding (MOU) between SFMTA and Transport Workers' Union Local 250-A (Union), of which he was a member.

SFMTA began installing video camera safety devices in SFMTA buses in November 2009. These cameras are known as DriveCams. A DriveCam is automatically triggered by unusual force such as hard braking, swerving, rapid acceleration or contact. It can also be turned on by manually pressing a blue button on the side of the DriveCam. Bus drivers were informed they could manually capture an event on their buses such as passenger problems, a fall on board, criminal or illegal activity or other security concerns by pressing the blue button on the device. A DriveCam captures video and audio.

Drivers were told by SFMTA that the DriveCam is working properly if there is a green light, a flashing green/red light (which meant the DriveCam was triggered), or a red light (meaning something was saved). Drivers were informed in General Bulletin (GB) 09-045 that if the left LED light was illuminated or flashing red, there was a problem with the DriveCam.

At the time of this incident, SFMTA had rules prohibiting "tampering" with DriveCams, including that "any tampering with the operation of the DriveCam is grounds for dismissal." (GB 09-045.) However, "tampering" was not defined. Further, Sisneros's training instructor had instructed Sisneros and other operators that malfunctioning DriveCams could be reset manually by pressing the blue button.

*The Incident*

On October 5, 2010, Sisneros was driving a bus behind a bus driven by Antonio Andino. Later that morning, Andino told Sisneros that his DriveCam was not functioning.

According to Sisneros, Andino asked him to reset the DriveCam on Andino's bus on October 5, 2010, because it was malfunctioning. Sisneros went in and out of Andino's bus several times and pressed the blue button on the DriveCam to try to reset it. Each time Sisneros pushed the button, the DriveCam made a new recording. These DriveCam recordings show someone (later identified as Sisneros) wearing sunglasses and a parka with the hood pulled up such that much of the person's face is concealed.

2

An SFMTA safety official who routinely reviewed DriveCam photos saw this footage and thought it showed someone tampering with the DriveCam device with what appeared to be a screwdriver. The safety official (Robert Mattox) forwarded the videos to Ayn Antonio, a SFMTA superintendent. Antonio investigated. She interviewed Andino, who at first denied knowing that anyone had entered his bus, and would not identify Sisneros.

*Sisneros's Meeting With Superintendent Antonio*

After Sisneros heard from Andino that he was being questioned, Sisneros asked to meet with Superintendent Antonio to explain what happened. Sisneros told Antonio that when he got to the end of the line on October 5, 2010, Andino was waiting by the restroom and mentioned that the light on his DriveCam was blinking red/green. Sisneros told Andino (and Antonio) that he knew from his past instruction that all he needed to do was push the blue button to reset the DriveCam. Sisneros offered to help out a co-worker and look into it for him.

Antonio then showed Sisneros the DriveCam videos and the coach video which show events occurring outside the bus at around the same time. Sisneros readily admitted to Antonio "that's me pushing the blue buttons." Sisneros denied that he was trying to inhibit the operation of the device. He told Antonio that he voluntarily went to meet with her because he heard that Andino had been placed on "non-driving status," and Sisneros wanted to clarify the incident.

Antonio asked Sisneros why he had the hood up over his head as if he were trying to conceal himself. Sisneros said that it was cold that morning, that he was wearing a Muni issued jacket, and asked, apparently rhetorically, "why does Muni give us hoods?"

*Notice of Proposed Discipline*

Antonio issued a Notice of Proposed Discipline recommending Sisneros's dismissal (Notice). The Notice has a section entitled "The Facts Upon Which the Charges are Based." Antonio described in detail what she believed could be seen and heard on the DriveCam videos and the coach video and concluded that Sisneros was tampering with the DriveCam on Andino's bus:

"The coach video starts off with Operator Andino standing outside the front of the bus. He can be seen holding his cell phone and eventually lighting up a cigarette and walking. An operator (who you have identified as yourself) wearing the foul weather jacket, with the hood covering the head, walks into the bus. You can see Op. Andino walking towards the front door as you tamper with the drive cam device. You then get off the bus and you and Op. Andino walk away from the bus. You then get back on the bus to tamper with the device. You then get off the coach and you two get together again. You then get on to tamper with the device and Op. Andino is seen walking away while on your cell phone. You are then seen as getting off the coach and you look at the coach and get back on and tamper with the drive cam device again."

Antonio recommended that Sisneros should be dismissed for "tampering with the operation of the drive cam" which is grounds for dismissal per GB 09-045; violating San Francisco Municipal Railway Rule (Rule) 2.7.1, which states that "[c]are must be exercised in the use of Railway property and every effort made to prevent damage or misuse;" and dishonesty, per Rule 2.8.9, which provides "[d]ishonest employees will not be retained in the service." Dishonesty is "sufficient cause for charges for disciplinary action involving suspension, or if appropriate, dismissal." (Rule 2.13.1.) The Notice of Proposed Discipline stated on this point: "You were dishonest when you tried to conceal your identity as you tampered with the drive cam device and per Rule 2.8.9, dishonest employees will not be retained in service. The drive cam video clearly shows your attempt to conceal your identity as you tampered with the drive cam device. You can be seen holding the collar of the jacket to cover part of your face as you tampered with the drive cam device."

*Step 3 Hearing*

Pursuant to the MOU, the Union requested a formal "Step 3 hearing," sometimes known as the "Skelly hearing," on behalf of Sisneros. The Skelly hearing was held on November 12, 2010. The DriveCam and coach videos were viewed at the hearing. Superintendent Antonio conducted the Skelly hearing, and sustained the same charges of tampering and dishonesty set forth in the Notice of Proposed Discipline. She

4

recommended that Sisneros be dismissed as a transit operator. SFMTA subsequently issued a "Step 3 Hearing Decision" upholding the decision to dismiss.

*Step 4 Hearing*

Sisneros and the Union requested a final administrative appeal of the decision, known as a Step 4 hearing under the MOU. In a document entitled "Request for a Step 4 Hearing," addressed to the Deputy General Manager, Human Resources, or Designee and Impartial Hearing Officer, Sisneros requested a hearing pursuant to section 326 of the MOU, and stated in pertinent part, "I would like to meet and confer on a choice of an arbitrator so we can mutually agree as per Civil Service Commission Rules. I waive no time or give time extensions unless a mutual agreement between myself, Bryan Schwartz, and the S.F.M.T.A. (MUNI). At this time I do not agree with Alexander Cohn as the arbitrator."

The Step 4 hearing took place on January 26, March 30 and April 26, 2011. The parties were given the opportunity to examine and cross-examine witnesses. Alexander Cohn, who apparently is the regular hearing officer for these hearings, was the arbitrator.[2]

The arbitrator concluded that the hearing was timely, notwithstanding Sisneros's argument that under the MOU it should have been held within 10 calendar days after receipt by the hearing officer of the appeal from the Step 3 decision. The arbitrator found that the parties "by practice and conduct" had agreed to modify the time limits for "years and years" and hold Step 4 hearings once a month on a set day.

As to the charge that Sisneros had tampered with the DriveCam on Andino's bus, the arbitrator found that there was "no screw driver visible in the footage," "there was no damage to the Drive Cam device" and SFMTA had not carried its burden of persuasion, although SFMTA "left no stone unturned in its effort to demonstrate" otherwise. The arbitrator explained his reasoning: "First, in meet and confer sessions, the Union asked

---

[2] Technically, Cohn was the "hearing officer" called for by the MOU. Sisneros refers to Cohn throughout as the "arbitrator," as did the trial court. We do so for clarity. Sisneros appears to have dropped his challenge to Alexander Cohn. The record is silent on this issue, and Sisneros has not raised it as a ground for appeal.

for a definition of 'tampering' from [SFMTA] management.  However, no definition was given.  That means the issue must be addressed on a case-by-case basis.  As a general rule, the implication of 'tampering" is an effort to prevent (impair) the device from performing its function.  Here, no matter how many times the blue button was pushed, a person's covered face is clearly seen.  Although it is not clear that it is in fact [Sisneros].  Consequently, it was working and, therefore, he did not impair the functioning of the Drive Cam.  Put simply, evidence that [Sisneros] was tampering with the Drive Cam is unpersuasive.

"Second, and of critical importance, it is concluded that (1) [Sisernos] was not using a screwdriver and (2) at that point in time, (a) the General Bulletin stated that Operators could 'manually capture' an event by 'depressing the blue button on the side of the device,' and (b) [SFMTA Training] Instructor Smith not only told Operators that they could push the Drive Cam blue button, but he, personally, demonstrated to [Sisneros] that he could re-set the device by pushing the blue button.  Although Smith testified that he did not 'instruct' [Sisneros] to do so, no other explanation makes sense.

"Finally, it was not the Drive Cam on [Sisneros's] bus.  What did he have to gain by impairing Andino's Drive Cam?"

With the tampering and attempt to destroy SFMTA equipment charges eliminated, the arbitrator was left with the dishonesty charge as the only possible basis for discipline and dismissal, or, as he put it, the "outcome determinative issue."  He aptly described this as a "nettlesome issue,"  because the SFTMA rules in existence on the day of the incident didn't prevent a bus driver such as Sisneros "from touching the Drive Cam; i.e., pressing the blue button."  Moreover, as the arbitrator found, Sisneros came forward and admitted that he was the person in the videos.

We quote from the arbitrator's conclusion on dishonesty as a basis for discipline:

"The video shows that on each of the four (4) times [Sisneros] got on Andino's coach, he pulled the bottom of his hood to cover his mouth and chin as much as possible.  He was also wearing sunglasses.  Thus, as little facial area as possible was seen.  Further, he not only gave vague answers to Antonio on the issue when questioned (e.g.,  it is an

6

Agency issued coat), only at the Step 4 Hearing did he say for the first time he had a medical condition which, in essence, necessitated covering up his head area. Put simply, after reviewing the video many times, it is concluded that preponderant evidence demonstrates [Sisneros] was purposely trying to conceal his identity, not merely protect himself from the weather."

"Accordingly, cause for discipline exists . . . ." The arbitrator concluded that the SFMTA had "just cause" to dismiss Sisneros.

After the Step 4 hearing and in accordance with the MOU, SFMTA, through its acting executive director and CEO, sustained the charges against Sisneros and dismissed him by letter dated July 20, 2011, attaching a copy of the arbitrator's written decision.

*Trial Court Proceedings*

Sisneros filed a petition for writ of mandate pursuant to section 1094.5 to direct SFMTA to reverse its decision terminating his employment and to reinstate him with back pay and benefits. The trial judge conducted a hearing and then took the matter under submission.

The trial court entered an Order Denying Petition for Writ of Mandate (Order) on July 5, 2013. The trial judge stated that he was applying the "independent judgment standard" to the disputed factual issues.

The trial judge found that the arbitrator had the authority to decide the timeliness issue, and that the administrative record supported the arbitrator's finding that the Step 4 hearing was not untimely.

As to the merits of Sisneros's discharge, the trial judge concluded in his written order that "the record as a whole supports the arbitrator's conclusion that Sisneros acted dishonestly by concealing his identity and providing evasive answers during the investigation."

This appeal was timely filed from the Order. The Order disposed of all of the issues in the case. For purposes of appeal, it serves as a final judgment although no separate judgment was entered. "When we determine whether an adjudication is final and appealable, the substance and effect of the adjudication is determinative, not the form

7

of the decree. When no issue is left for further consideration, the decree is final." (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1074 (*Breslin*) [appeal from order denying petition for writ of mandate and injunctive relief].)

DISCUSSION

I. *Standard of Review*

Judicial review of SFMTA's decision to terminate Sisneros is governed by section 1094.5. It is undisputed that Sisneros's discharge from employment affected a "fundamental vested right." (*Brush v. City of Los Angeles* (1975) 45 Cal.App.3d 120, 123.) As such, the trial court in the first instance must "independently review the agency's findings to determine if they are supported by the weight of the evidence. (*Welch*[ *v. California State Teachers' Retirement Bd.* (2012)] 203 Cal.App.4th [1,] 16 [(*Welch*)]; see also Code Civ. Proc., § 1094.5, subd. (c) ['in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence'].) In doing so, however, the court ' "must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." ' (*LaGrone v. City of Oakland* (2011) 202 Cal.App.4th 932, 940 (*LaGrone* ).)

"On appeal from a decision of a trial court applying its independent judgment, we review the trial court's findings rather than those of the administrative agency. (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 612 . . . .) Specifically, we review the trial court's factual findings for substantial evidence. In doing so, we must resolve all conflicts in favor of . . . the party prevailing below. Further, we cannot reweigh the evidence. Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court. (*Natalie D. v. State Dept. of Health Care Services* (2013) 217 Cal.App.4th 1449, 1455; see also *LaGrone, supra,* 202 Cal.App.4th at p. 940.) In sum, '[t]he question on appeal is whether the evidence reveals substantial

support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the [agency's] findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable. (*Breslin*[*, supra,*] 146 Cal.App.4th [at p.] 1078 . . . .)' " (*Duarte v. California Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 383-384.)

II. *Sufficiency of the Trial Judge's Findings for Purposes of Appellate Review*

As a threshold issue, Sisneros contends the trial judge's findings are inadequate for appellate review. Sisneros acknowledges that the trial court was required to exercise its independent judgment in reviewing SFMTA's decision, but argues, based on *MHC Operating Ltd. Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 218 (*MHC*), that the trial judge had a duty to make "independent findings illuminating the 'factual bases for its decision.' " Sisneros argues that this duty to make independent findings was "neglected" because the trial court's analysis of the merits of the writ petition consists of one sentence which states an "ultimate conclusion," rather than a finding of fact or reference to the record, and it is thus impossible for the appellate court to review the trial court's decision for substantial evidence. Sisneros urges this as a ground for reversing and remanding to the trial court.

Sisneros's argument is based on language taken out of context from *MHC*. It does not support his position. *MHC* was a consolidated appeal regarding a mobile home park owner's application for an extraordinary rent increase under San Jose's mobile home rent control ordinance. In setting out the standards of appellate review, the court in *MHC* cited a reference book on administrative mandamus for the proposition that where a fundamental vested right is affected and the standard of review in the trial court is the independent judgment test, the Court of Appeal reviews the " 'trial court's factual bases for its decision, not the findings of the agency.' " (*MHC*, *supra*, 106 Cal.App.4th at p. 218.) *MHC* did not address the nature, form, quality or extent of a trial court's factual bases for its decision. The issue on appeal in *MHC* did not even involve a fundamental vested right. (*Ibid.*)

9

The other cases cited by Sisneros as authority for the proposition that this case should be reversed for failure to make specific findings of fact are also distinguishable. *Allegretti v. Bd. Of Osteopathic Examiners* (1956) 145 Cal.App.2d 435 was an appeal from a judgment denying a writ of mandate sought by an osteopath whose license was suspended because he was identified in the telephone book with the suffix " 'M.D.' " (*Id.* at p. 436.) The trial court found that the improper listing was the result of a mistake by the telephone company and that petitioner was guilty of "at least a technical violation of the law" (*id.* at p. 439), but did not address whether petitioner acted "innocently or with ulterior motives." (*Id.* at p. 442.) The Court of Appeal reversed for a retrial on this unanswered issue; without it the findings did not support upholding the agency's punishment of suspension. The opinion is silent on the standard of review by the trial court or the Court of Appeal, or the specificity of fact finding when the court exercises its independent judgment.

*Barber v. Long Beach Civil Service Commission* (1996) 45 Cal.App.4th 652, is also inapposite. In that case, the trial judge was required to exercise the "independent judgment" standard of review in considering a petition for writ of administrative mandate challenging a police officer's dismissal for misconduct. (*Id.* at p. 658.) The trial judge made statements that clearly showed he misunderstood the standard of review. Because the "trial court's mistake [went] to the heart of this case" (*id.* at p. 659), the Court of Appeal remanded the matter for a new trial.

Similarly, *Parker v. Contractors State License Bd.* (1986) 187 Cal.App.3d 205 is distinguishable. In *Parker*, the trial court granted a writ of mandate directing the agency to set aside its decision to suspend Parker's license. (*Id.* at p. 208.) However, the trial court failed to make a finding in its statement of decision as to whether Parker's conduct was fraudulent and willful, despite a specific request by the agency for a finding on that point. (*Id.* at p. 210.) Without such a finding, the appellate court could not determine the basis for the decision to discipline Parker and could not review the decision. (*Id.* at p. 211.) The appellate court reversed and remanded to the trial court to make the necessary findings. (*Id.* at p. 212.)

In contrast to the cases cited by Sisneros, the trial judge here understood the standard of review and made the findings necessary for this court's review. He stated that he had "independently reviewed the evidence," and identified the portions of the arbitrator's conclusion that he found were supported by the "record as a whole." The trial judge's five-page order began with a page and a half statement of the underlying facts and procedural history of the case. The 25-page hearing transcript is studded with questions that reflect the trial judge's familiarity with the record, and his observations on the evidence. We presume that the trial court carried out its duties as it stated it did. (Evid. Code, § 664; see *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324 ["it is the trial court's role to examine the evidence, and we presume the court performed its duty," citing Evid. Code, § 664]; *Adams v. Adams* (1952) 113 Cal.App.2d 654, 656 ["the agreement was admitted in evidence and we must assume that it was considered by the court in connection with all the other evidence"].) No remand for findings is required.

III. *Substantial Evidence Supports the Trial Court's Finding Regarding the Timing of the Step 4 Hearing*

As another threshold issue, Sisneros contends it was error to deny the petition for writ of mandate because the Step 4 hearing was held more than 10 days after Sisneros filed his notice of appeal from the Step 3 decision, contrary to the terms of the MOU. Sisneros argues the MOU compelled the arbitrator to grant the grievance because of the delay, without reaching the merits, and the arbitrator acted in excess of his power by conducting the late hearing. Compounding the error, SFMTA allegedly acted in excess of its jurisdiction within the meaning of section 1094.5, subdivision (b) when it accepted and acted upon the arbitrator's recommendation rather than concluding that the grievance had to be granted because of the delay. Sisneros contends that we should review this issue de novo because it is a conclusion of law and involves the interpretation of a contract.

We disagree. Although Sisneros tries to frame the issue as one of law regarding whether an agency acted in excess of its jurisdiction, the issue actually presented here is

11

the propriety of the trial judge's finding that there was a waiver of the 10-day requirement. Waiver is generally a question of fact. (*Saint Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.) We review the trial court's finding on this issue for substantial evidence.

A. *Grievance Procedure in the MOU*

Article 27 of the MOU, entitled "Grievance Procedure," sets out the pertinent language. Regarding Step 4, known as the "arbitration level," the MOU states the following:

"The Union or the grievant may, at any time within seven (7) days after the mailing of the Step 3 decision, appeal from such decision to the impartial hearing officer by filing written notice of the appeal with the Deputy General Manager, Human Resources or designee and impartial hearing officer, except where the appeal is from a proposed disciplinary dismissal, in which event the appeal must be initiated within one (1) day of the Step 3 decision. *The impartial hearing officer shall conduct a hearing on the grievance or grievances submitted to him/her within ten (10) days after receipt by him/her, except when the grievance involves a proposed disciplinary dismissal . . . in which event the hearing shall begin within (10) calendar days. . . .*" (MOU § 326, emphasis added.)

The MOU also contains these pertinent sections regarding timeliness:

"The time limits in the grievance procedure will be strictly adhered to." (MOU § 317.)

"Extensions will be granted only in writing by mutual agreement, and only in exceptional cases." (MOU § 318.)

"*If management fails to meet the time limits at any point in the procedure, the grievance will be granted*. If the Union fails to meet the time limits at any point in the procedure, the grievance will be withdrawn." (MOU § 320, emphasis added.)

"In computing the time within which any action must be taken under the foregoing procedure, Saturdays, Sundays, and holidays shall not be counted. A grievance may be denied at any level because of failure to adhere to the time limitations." (MOU § 328.)

Finally, the MOU addresses the choice of hearing officer and sharing of costs:

"The MTA Executive Director or designee and the Union shall endeavor to agree upon an impartial hearing officer to serve for an agreed period of time. Should these parties fail to reach such agreement within twenty (20) days after the execution of this agreement, then, upon the written request of either party, the American Arbitration Association shall have the authority to appoint an impartial hearing officer pursuant to its rules, who shall serve for an agreed period of time. The cost of the services of the impartial hearing officer shall be shared equally by the Union and MUNI, except that if the grievant reaches Step 4 without Union participation, the cost shall be shared by the grievant and MUNI. In the event the grievant does not desire to share in the cost, Step 4 shall be bypassed." (MOU § 331.)

B. *Analysis*

The trial court found that the arbitrator had the authority to consider Sisneros's timeliness objection, including whether a term in the MOU had been waived or modified. In rejecting Sisneros's argument that the terms of the MOU mandated that the arbitrator simply grant the grievance, the trial court relied on *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179 for the proposition that an arbitrator may apply equitable defenses to excuse a party from performing a material condition of an agreement.

The trial judge wrote on this issue, "The arbitrator found 'For years and years, the parties have agreed to have one day a month wherein multiple Step 4 hearing [sic] are held in order to not only save resources but to be able to have a full time, permanent neutral Hearing Officer hear and decide the cases on an advisory basis. . . . Put simply, the parties—by practice and conduct—have agreed to modify otherwise unambiguous time limits in the grievance handling process.' This Court agrees with the arbitrator, and the administrative record supports a finding that the Union entered into a longstanding waiver of time limits for Step 4 grievance hearing."

The trial judge also found that the Union was the exclusive bargaining agent for Sisneros, and Sisneros was bound by the Union's longstanding waiver.

13

Substantial evidence supports the trial court's findings. It is undisputed that Sisneros was a member of the Union. There was substantial evidence that Sisernos was not pursuing the Step 4 proceeding on his own. On November 12, 2010, the Union sent a letter on Union stationery to SFMTA requesting a Step 3 grievance "on behalf of" Sisneros. When it was time to appeal the Step 3 grievance, Sisneros's attorney wrote to SFMTA (copying the acting president of the Union local) that Sisneros "would like to pursue the Step 4 grievance, *in cooperation with the Union*." (Emphasis added.) The arbitrator found that "[a]lthough it is apparent that [Sisneros's] attorney was used, the Union ultimately took responsibility for bringing this case to Step 4." The Union and Sisneros did not make separate arguments at the hearing.[3]

The evidence showed that for at least 10 years, the Union, SFMTA and the hearing officer held Step 4 arbitrations once a month, rather than adhering to the 10-day rule. The two parties to the MOU (SFMTA and the Union) agreed to this procedure as a way to save resources, have a neutral hearing officer available to hear cases, and avoid scheduling problems. The executive vice president of the Union testified that it was "set policy" for the Union to waive the 10-day rule, and that the Union did not always put its waiver in writing.

There was thus substantial evidence supporting the trial court's finding that the Union, as Sisneros's exclusive bargaining agent, waived the 10-day rule, and that it was binding on Sisneros in this case.

Further, we note that Sisneros has not established that SFMTA failed to meet the grievance time line. The December 1, 2010, letter ("Request for a Step 4 Hearing") is addressed to SFMTA and to "Impartial Hearing Officer." The MOU states "[t]he *impartial hearing officer* shall conduct a hearing on the grievance . . ." (MOU § 326,

---

[3] The arbitrator's recommended opinion and award captions the case "In the Matter of A Controversy between TWU, Local 250-A and SFMTA," and lists the two parties as the Union and the Agency. The arbitrator called on Sisneros's attorney to make closing argument by asking "is the Union ready," and Sisneros's counsel did not correct him.

14

emphasis added), but Sisneros points to no evidence as to who is responsible for scheduling the hearing. Since Sisneros has not established that SFMTA, i.e., "*management*," "fail[ed] to meet the time limits" under MOU section 320, there is no basis to automatically grant the grievance for lack of timeliness under that section.

IV. *Substantial Evidence Does Not Support the Trial Court's Order Denying the Petition On the Ground that Sisneros Acted Dishonestly*

In his written order, the trial court found that the DriveCam videos show Sisneros wearing "sunglasses and a parka with the hood pulled up," and that Sisneros "arranges the hood to conceal his face." On the merits, the trial court denied the petition because "the record as a whole supports the arbitrator's conclusion that Sisneros acted dishonestly by concealing his identity and providing evasive answers during the investigations."[4]

We conclude that substantial evidence does not support the trial court's finding that Sisneros was dishonest.

We start with the clothing. Sisneros was wearing a hooded parka issued by SFMTA. There was no regulation that prohibited Sisneros from wearing the parka or pulling up the hood and closing the side flaps. Wearing the parka during work hours on a bus is not substantial evidence of concealing identity. When Sisneros's supervisor asked him why he was wearing the jacket with the hood, he said he was cold.

Similarly with the sunglasses. There is nothing in the record to support that wearing sunglasses violated SFMTA rules. Further, it was undisputed that Sisneros's

---

[4] The trial court clearly agreed with the arbitrator that the tampering charge was not supported by the evidence, although this is not explicitly stated in the written order. At the hearing on the petition, the trial court recognized that the arbitrator "quite carefully found" that the SFMTA rules at the time did not prevent Sisneros from manipulating the DriveCam. The trial court acknowledged that there was "no evidence that Sisneros had a tool," including the screwdriver that SFMTA accused Sisneros of using. The trial court observed that the arbitrator "goes through and basically dismantles any claim that Mr. Sisneros was deliberately trying to erase something on the device." The trial court later characterized the state of the evidence in this colloquy with Sisneros's counsel: "And for purposes of your argument, you should think that the [SFMTA's] case fell apart pretty badly. There's some suspicion that Mr. Sisneros was trying to eliminate evidence that he was driving unsafely, that's pretty murky."

sunglasses are "transitionals" that he wears indoors and outside, meaning that they "clear up" depending on the light. The DriveCam videos show the glare of sun in the windshield.

There is no evidence that Sisneros attempted to conceal his identity from SFMTA after the incident. He came forward on his own, and made an appointment to see Antonio the day after she met with Operator Andino. As Superintendent Antonio wrote in the Skelly decision, "*you* [Sisneros] *asked to meet with me to explain the incident*." (Emphasis added.)

There is no evidence that Sisneros attempted to conceal his identity from SFMTA at his meeting with Superintendent Antonio. Sisneros presented his explanation of what happened on the day in question. He did not deny that he was on Andino's bus. According to Superintendent Antonio, Sisneros readily identified himself in the DriveCam and coach videos. As Antonio wrote in the Notice of Skelly Decision, "I then showed you the drive cam videos. *You identified yourself* as being the person on the drive cam video. [¶] We then viewed the coach video. *You again stated, 'ya, that's me pushing the blue buttons.'* " (Emphasis added.) There is no evidence that Sisneros *ever* denied that he was the person in the DriveCam or coach videos. The acts he told Antonio he engaged in—depressing the blue button repeatedly to reset the camera—were the acts that SFMTA characterized as tampering but ultimately failed to establish as a basis to dismiss him.

Nor is there substantial evidence that Sisneros provided "evasive answers during the investigations." Although the trial judge does not identify the evasive answers in the Order, it is apparent that he is referring to Sisneros's responses to the question that Antonio asked him at their meeting on or around October 27, 2010, to discuss the incident: why he was wearing a coat and covering his head. These are the "vague answers" referred to in the arbitrator's decision, quoted above.

We conclude that Sisneros's answers are not substantial evidence of dishonesty. We look to Superintendent Antonio's own words in the Notice she sent to Sisneros apparently on or shortly after the day she met with him. After writing that Sisneros

16

explained the incident (including that he had reset the blue button) she wrote: "When asked as to why you had your hood up over your head as though attempting to conceal yourself, you stated that it was cold out there. You also said, 'why does Muni give us hoods?'"

Sisneros never varied from his statement that he was cold, and the evidence that he felt cold was never rebutted. At the Step 4 grievance hearing, when he was asked by SFMTA's attorney why he was bundled up in a coat with a hood over his face, Sisneros answered that "[w]e've suffered some cold mornings, and I suffer from a medical problem, and I have cold spells." When he was asked the "nature of that [medical] problem," Sisneros testified that he did not want to discuss the nature of his medical problem. When SFMTA's counsel replied, "[w]ell, I mean, I don't want to intrude unduly at [sic] your privacy, but you raised it," the arbitrator interjected: "You can argue the inference; let's move on."

In response to further questioning at the hearing, Sisneros testified that he had "hot and cold spells" frequently "[t]hroughout the day." He could not predict when they come on, and they occur without regard to the weather.[5] Sisneros testified that he did not tell Antonio about his medical condition at the time of their interview because it was "[k]ind of private."

When Sisneros's counsel questioned Sisneros later in the Step 4 hearing, he asked why Sisneros was wearing a coat with a hood on the day of the incident, and elicited this testimony:

"Q: Now, previously, you testified you were reluctant to give details about your medical condition, and we've had a chance to talk since then. Just very briefly, in the most basic way for the sake of this proceeding, what medical condition is it that relates to you wearing a coat with a hood that day?

---

[5] "[S]ometimes I'll be very cold when it's nice outside, or I'll be very hot and it's cold." Sisneros testified that people sometimes comment to him about why he is wearing a jacket when it's hot outside, and vice versa.

17

"A: For the record, I don't want to state this willingly, but I'm going to on my behalf. I have prostate and kidney problem, and it creates a hormonal imbalance.

"Q: Have you seen a doctor about that?

"A: Yes.

"Q: Do you take medications related to those problems?

"A: Yes.

"Q: What medications do you take?

"A: Flomax for one, and I don't know the name of the other one until I see it in front of me, but they're on a daily basis.

"Q: So what are some situations in which the hormonal imbalance might cause hot or cold spells?

"A: I don't know. They come and go.

"Q: How often?

"A: On a good day, three. On a bad day, nine. . . .

"Q: Were you undergoing a hot or cold spell at that time when you were wearing the coat with a hood?

"A: Yes.

"Q: Which one?

"A: I was having a cold spell when I got off the bus and went to the restroom.

"Q: What was the weather like at—you testified it was at Geneva and Munich. What was the weather like at that time?

"A: I couldn't tell you. I mean, is that—it was cold for me. So I got—you know, I put on my jacket. It's a Muni issued jacket. . . ."[6]

---

[6] SFMTA points to a weather report from the day in question that the temperature at San Francisco International Airport around the time of the incident was 64.9 degrees. It is undisputed that the area of Geneva and Munich, where the incident occurred in San Francisco, is not the San Francisco Airport. Sisneros testified that he grew up in the neighborhood near Geneva and Munich, and the climate there is windy and cold and changes quite often. This was not disputed.

18

Sisneros did not want to reveal his medical information to Antonio when he went to talk to her about the incident in the first instance. He believed his medical information was "private," and the discussion with her "was not going very positive" from his perspective. In other words, he believed that she was hostile.[7] The fact that Sisneros was reluctant to disclose what he considered private medical information about *why* he was cold is not substantial evidence that he gave evasive answers to his supervisor in investigations. There is no substantial evidence to support that Sisneros did not feel cold at all on October 5. And the fact that he did not disclose the medical reason until the Step 4 hearing is not evidence that he was evasive, either. If anything, it is simply further evidence explaining *why* he felt cold that day.

Finally, we note that there is no substantial evidence of motive for Sisneros to be dishonest about what he was doing with the DriveCam on Andino's bus. As we described above, the arbitrator found that Sisneros had nothing to gain by impairing Andino's DriveCam. SFMTA argues on appeal that Andino testified that Sisneros was following him too closely, that Andino testified that at one point on October 5 his DriveCam came on when Andino hit a pothole, and that the DriveCam might have picked up footage of Sisneros's bus if Sisneros had been following Andino too closely. On this theory, Sisneros might have wanted to tamper with Andino's DriveCam to destroy evidence of Sisneros following too closely behind Andino's bus, if indeed he was.

The problem with this theory is that it is not supported by evidence in the record, let alone relied on by the arbitrator or the trial judge. Further, the evidence is to the contrary. Antonio admitted that she had no evidence that Sisneros took any action which had the effect of hindering the function of the DriveCam.[8] She admitted that the

---

[7] Antonio sought to dismiss Sisneros in 2007, but no action was taken.

[8] Robert Mattox, a safety manager at SFMTA who testified about the operation of the DriveCam, stated that nothing that Sisneros did in touching the blue button on the DriveCam in Andino's bus corrupted any of the data in the DriveCam.

DriveCam is "not designed to capture a bus tailgating another bus."[9] She further admitted that she had no evidence of Sisneros's motive to touch the DriveCam on Andino's bus. Sisneros was never charged with tailgating Andino's bus, and there is no evidence that supports the existence of a "no tailgating rule" as a ground for termination.

In sum, the arbitrator aptly described the dishonesty charge against Sisneros as a "nettlesome issue." At the outset of the investigation, the SFMTA safety officer who reviewed the DriveCam footage thought he saw someone holding what appeared to be a screwdriver while manipulating the DriveCam. He forwarded the footage to superintendent Antonio with his conclusions that this was a DriveCam tampering case. Viewed from SFMTA's prism that Sisneros committed actionable tampering with the DriveCam sufficient to warrant his dismissal, it may be understandable that SFMTA tacked on a charge of dishonesty based on Sisneros wearing a parka with the hood up and saying he was cold when Sisneros denied tampering and offered his explanation of the incident. But when SFMTA's case for tampering was, in the words of the trial judge, "dismantle[d]" at the Step 4 arbitration, there simply was no substantial evidence on this record to support a finding of dismissal for dishonesty.[10]

## DISPOSITION

The order denying the petition for writ of administrative mandate is reversed. The matter is remanded to the trial court with instructions to enter a new order granting the writ directing SFMTA to reinstate Sisneros to his position as a bus driver with full back pay and benefits, and for further proceedings consistent with this opinion. Sisneros shall recover his costs on appeal.

---

[9] SFMTA safety manager Mattox testified that the DriveCam isn't triggered by tailgating or pulling up close to another bus. This matched Sisneros's understanding of how DriveCams operate. ("The buses are put into barns almost sometimes 12 inches from the next bus. We start up the buses in the morning. They're [DriveCams] not set off.")

[10] In light of our holding, we do not reach the merits of Sisneros's argument that the trial court erred by not holding that SFMTA's decision was "not supported by the findings" pursuant to section 1094.5, subdivision (b) and that this court must review the entire record as a whole to make that determination.

20

_____

Miller, J.

We concur:

_____

Kline, P.J.

_____

Richman, J.