Filed 4/5/21  L.B. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| L.B. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A161673<br><br>(Contra Costa County Super. Ct. No. MSJ18-00482) |

L.B. (mother) and A.C. (father; together with mother, "parents") petition for extraordinary writ relief challenging certain orders at an 18-month review hearing in the dependency case of their child, M.C. (minor).  Father argues the juvenile court should not have set a hearing under Welfare and Institutions Code[1] section 366.26 because it should not have found a substantial risk of detriment to the minor's well-being if the minor were returned to father's care.  Father and mother both contend the juvenile court should have extended their reunification

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

services because the Contra Costa County Children and Family Services Bureau (Bureau) failed to provide them reasonable services. Father and mother also contend the juvenile court should not have reduced their visitation and should have granted their requests for a bonding study. We agree that the record does not support the decision to reduce their visitation, but otherwise find no error. We shall therefore grant the parents' writ petitions in part, order the juvenile court to vacate its visitation order, and otherwise deny the petitions. We shall deny as moot the parents' request for a stay of the section 366.26 hearing, scheduled for April 7, 2021.

## I.  BACKGROUND

### A. Initial petition

The Bureau filed a petition as to the minor and the minor's newborn sibling in April 2018, when the minor was seven years old. The Bureau had a history of contacts and intervention with regard to the minor and the minor's parents. The juvenile court assumed jurisdiction over the children based on allegations that father was unable to regulate his aggressive emotional outbursts and to understand the impact of these outbursts and that mother's ongoing medical condition made her unable to care for the minor.

Mother presented with severe mental and/or developmental disabilities. She suffered from conversion disorder, which manifested as her being unable to walk and having seizures, even though medical

2

exams showed no reason for the symptoms.[2] Mother alleged that father raped her "all the time" and had punched holes in the walls of the home where the family lived with the minor's paternal grandmother. Mother also claimed, however, that father had never been physically abusive towards her or the minor. The juvenile court allowed the minor to remain in the home with father but removed the minor's sibling.[3]

### B. Disposition hearing on initial petition

When the Bureau filed the petition, mother was in the hospital for the birth of the minor's sibling. Adult Protective Services had assisted mother with obtaining a restraining order against father. By the disposition hearing in August 2018, mother was again residing with father and the minor. Mother's physical health was unpredictable, sometimes improving and sometimes declining. Mother was inconsistent in her participation in health services and had refused physical therapy.

In October 2018, mother and the maternal grandmother told a domestic violence liaison that mother wanted to leave father's house. The liaison recommended that mother receive domestic violence counseling and become a client of the Regional Center so she could

---

[2] Conversion disorder "is defined as '[o]ne or more symptoms of altered voluntary motor or sensory function' found to be incompatible with 'recognized neurological or medical conditions.' (American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) pp. 318–319.)" (*Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 746, fn. 2, italics omitted.)

[3] The juvenile court ultimately terminated mother's and father's parental rights over the minor's sibling, and the foster family where the minor was later placed adopted the sibling. None of the juvenile court's orders relating to the minor's sibling are at issue here.

enroll in a program empowering people with disabilities. The Bureau stated it would assist mother in assessing her eligibility for Regional Center services.

The disposition hearing was continued several times, in part because the juvenile court appointed a guardian ad litem for mother. At the conclusion of the disposition hearing in January 2019, the juvenile court placed the minor in the parents' custody under the Bureau's supervision and ordered the Bureau to provide the parents family maintenance services. The Bureau recommended mother receive individual counseling to address her mental health, because it was the sole cause of her medical conditions. The Bureau also recommended she undergo a domestic violation assessment, participate in services through a wellness recover action plan, and engage with health care professionals to improve her health. For father, the Bureau recommended communication/socialization and parenting classes, individual counseling, and domestic violence services.

### C. Supplemental petition

In May 2019, the Bureau detained the minor and filed a supplemental petition under section 387. As later amended, the supplemental petition alleged that father had struck mother many times in the past, raped her about a month earlier, punched her in the head, intentionally hit her head on the car when helping her out of the car, and broke her cell phone in half and threw it at a wall. At the time, mother was wheelchair-bound and had difficulty talking. The Bureau also alleged that father had failed to participate in treatment recommended by the minor's psychologist and that he had failed to adequately address the minor's hygienic needs. The former allegation

4

related to alleged autism-related deficits in the minor's social and communication abilities.

When the Bureau filed the supplemental petition, mother told a social worker and police officer that she did not feel safe returning to the home with father and feared for the minor's safety. Regular shelters would not accept mother because of her medical conditions, so mother was taken to the Regional Center in Martinez. Mother had previously made claims of domestic violence and rape and had always returned to father's home despite opportunities to leave. Consistent with this pattern, shortly after making her allegations of abuse, mother claimed it was an accident and father did not hurt her. Using dramatically improved speech, mother also said she wanted to go back to father's home. By the end of May 2019, mother was residing with father.

By the time of the jurisdiction hearing in August 2019, father was enrolled in a domestic violence program, but he told the counselor that he did not understand why he was there. According to the counselor, this was a barrier to engagement. Mother was participating in group therapy sessions but would soon shift to individual sessions. Visits between the minor and father showed the two had a deep, affectionate bond. The court assumed jurisdiction over the minor based on the amended allegations in the supplemental petition and placed the minor in a foster home.

### D. Disposition hearing on supplemental petition

The Bureau's report for the disposition hearing on the supplemental petition in November 2019 stated that it was in the minor's best interest to bypass reunification services for the parents.

Father admitted he had an anger problem but continued to deny the allegations that led to the minor's removal. Father's domestic violence counselor and mental health counselors said that father attended sessions but had little interest in learning the material and it was unclear whether father was benefitting from the programs. Mother had started individual domestic violence counseling and said she was ready to leave the home. However, it was difficult to get services to help mother find alternative housing because of her physical conditions and because she had refused help from service providers several times before. The Bureau had referred mother to the Regional Center. To confirm mother's eligibility the Regional Center needed medical records showing mother had been diagnosed with a qualifying disorder before the age of 18. The Bureau's social worker had been unable to find anything in mother's records that would establish mother's eligibility. The minor had been diagnosed with autism spectrum disorder and was recommended for group therapy. Father continued to be very loving and appropriate with the minor during visits, and he occasionally prompted the minor to interact with mother. Despite its belief that services should be bypassed, at the county counsel's request, the Bureau submitted a recommendation for further services.

The court found father had made minimal progress and mother had made minimal or unknown progress towards alleviating the causes of the dependency. The court further found reunification was in the minor's best interest and ordered the Bureau to provide reunification services. The court ordered father to have a comprehensive psychological evaluation. The court reduced visits from weekly to twice per month.

### *E. Combined six- and 12-month review hearing*

Leading up to the combined six-month and 12-month review hearing in August 2020, mother continued to live with father. The Bureau concluded the fundamental family dynamic had not changed: father continued to deny domestic violence in the relationship and mother continued to rely on him as her full-time caregiver. Mother had recently fallen from her wheelchair, broken her two front teeth and a veneer tooth, and injured her face and lips, but no medical or dental treatment was sought because of the cost. Mother initially wanted her own apartment, but a social worker from Adult Protective Services recommended a skilled nursing facility with an eventual transition to assisted living, since mother could not care for her own needs. Mother then stopped responding to the social worker, and Adult Protective Services closed their case. The Bureau's social worker had still been unable to find any indication in mother's records that would establish mother's eligibility for Regional Center services. Mother eventually told the Bureau she was willing to accept a skilled nursing facility. The Bureau's social worker had directed mother to speak with her doctor about a referral, but despite the social worker's offer to help with the conversation, mother had not spoken with her doctor.

Father continued to deny any domestic violence incidents. While he participated in domestic violence classes, he did not take accountability for his actions. Father's domestic violence classes were cut off several times, once because of the pandemic and several other times because of a payment issue. During one visit between the parents and the minor, father became irate with the paternal grandmother and referred to mother as "dumb mommy" to the minor.

The Bureau recommended terminating services and setting a hearing under section 366.26.

At the combined six- and 12-month review hearing, mother told the court she wanted to remain in a relationship with father and did not want to move out of the home. Mother also said that she did not want to enter a skilled nursing facility because she was afraid of contracting the coronavirus, although mother's resistance to this idea predated the pandemic. The court found reasonable services had not been provided and ordered the continuation of services to 18 months. The court specifically ordered the Bureau to explore creative opportunities for services for mother if she were to continue living in the home. The court also ordered the Bureau to fix the issues with father's domestic violence program and assist him with getting into therapy immediately.

## F. 18-month review hearing

Ten days after the prior hearing, mother denied saying that she wanted to remain in a relationship with father and told the Bureau she wanted to be out of father's house. Mother denied alleging father physically assaulted and raped her. She also told the social worker she agreed with the maternal grandmother that women subjected to domestic violence should not tell anyone about their abuse in order to avoid having their children removed.

The parents attended five sessions of couples counseling via video calls but were unable to agree on treatment goals and were volatile toward one another. The couple's therapist reported that both parents were prone to angry outbursts, and father's outbursts included yelling, pacing, and hitting furniture. The couple's therapist had concerns

about mother's and father's cognitive functions, but found it difficult to assess because both parents, especially mother, were manipulative during the sessions by pretending not to know or remember things.

Father reported that he completed a group behavioral therapy program aimed at helping him deal with stress. Father participated in five sessions of individual therapy aimed at working on impulse control and anxiety. However, he was unable to explain to a social worker how impulse control related to his behavior or provide examples of how his impulse control had improved. Father had only a few sessions left to complete his domestic violence program, which was teaching him about his anger. But aside from reading descriptions of concepts from his notes, the only example he could cite of what he had learned was that if he became angry with mother, such as if she were unfaithful, he would watch wrestling because that normally calms him down.

At the hearing, mother testified that she had never said that father had raped her. She planned on moving in with her cousin but had not spoken to her. A few months earlier she had tried calling to find a new place to live. She stopped thinking about it after the programs she called said they were full because she was happy.

Father testified about his sessions with his individual therapist. One tool he had learned was that when he was feeling stressed, he should remove himself from the situation, such as by leaving the room and watching videos or playing a game. Father testified that his relationship with mother had ended a month earlier. Mother was still living in the home, but the two had been sleeping in separate rooms for about a week. Father reported that he and mother had learned through counseling that they did not work as a couple because mother

9

did not want to be in a relationship, while father was willing to work on things. Because they were no longer in a relationship, he did not foresee having any problems with mother, even though they were still living together. Father still expected that he and the paternal grandmother would continue to be mother's caregivers.

Father admitted he had broken things in anger in the past but denied hitting furniture during his online therapy sessions. Father also admitted he had gotten in mother's face, yelled, screamed, and thrown things across the room, but he denied ever engaging in physical violence except for pushing her on a bed once. He also denied head-butting mother in the minor's presence, even though that had led to the removal of the minor in a prior dependency case.

Mother then testified again in response to father's testimony. She said besides headbutting and pushing her, father had struck her in the face. After her counsel interrupted the questioning to consult with mother, mother returned to the stand and claimed the violence occurred long ago, though she added that father had also broken her phone.

The juvenile court reviewed the factual development of the case and described in some detail the results of father's psychological evaluation from July 2020. The psychologist said father denied he was violent, viewed his domestic violence classes as stupid, and had no evidence of a cognitive impairment or developmental delay. In the psychologist's view, the core issue was father's tendency towards denial and his inability to recognize the impact of his behavior on mother. The psychologist determined father had a lack of insight.

The court found the circumstances that gave rise to the case had not been ameliorated, with mother living in the same home, alternating between allegations of domestic violence and recantations, and father still having angry outbursts without any insight and denying his abuse. The juvenile court found father had lied about the abuse. The court credited mother's testimony at the hearing about the abuse and did not credit mother's attempt to partially retract her testimony by claiming the abuse had occurred in the distant past. The court found that the Bureau offered reasonable services in the 18-month review period and that the return of the minor to the parents' custody would create a substantial risk of detriment to the minor's safety or physical or emotional well-being. The court found no exceptional circumstances to warrant extending services past the 18-month mark and ordered the termination of reunification services. The court reduced visitation to one hour per month and set a date for a hearing under section 366.26.

## II.   DISCUSSION

### A. Return of the minor to father

At an 18-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) The court "shall consider the efforts or progress, or both, demonstrated by the

11

parent . . . and the extent to which he or she availed himself or herself of services provided . . . . " (*Ibid.*)

We review the juvenile court's findings for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.) Under this standard, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Substantial evidence supports the juvenile court's finding of detriment based on father's failure to make substantive progress in his treatment plan. Father participated regularly in the domestic violence and counseling sessions the Bureau selected in the sense that he attended the sessions. But the various therapists' descriptions of father's attitude and behavior changed little over the course of the case. In October 2019 (prior to the completion of the disposition hearing on the supplemental petition), father's domestic violence counselor said father attended the program but did not know why he was there and spent his time rolling his eyes and scoffing rather than engaging with the curriculum. In November 2019, father's therapist said that father attended group sessions but did not participate in self-reflection. Father believed that he did not have anything to work on and that his behavior was not a problem. The psychological evaluation of father in July 2020 noted that father described his domestic violence classes as

12

stupid and the other participants as morons.  In October 2020, father was unable to tell a social worker any examples of how his work in his individual therapy sessions and domestic violence classes related to his behavior and life.  At the last report before the 18-month hearing, the couple's therapist said both parents were volatile towards one another.  The therapist also described how father would have angry outbursts during therapy sessions that involved yelling, pacing, and hitting furniture.  At the hearing, father continued to deny engaging in physical violence against mother.  The juvenile court found this denial not credible when contrasted with mother's rebuttal testimony describing specific acts of abuse.

Pursuant to section 366.22, this evidence of father's substantially unchanged attitude over the course of the case, despite receiving services, is prima facie evidence of detriment.  (§ 366.22, subd. (a)(1).)  In response, father asserts that he participated in all aspects of his plan and some aspects of his plan were not completed because of the pandemic and the Bureau's failure to provide reasonable services, as the juvenile court found at the combined six- and 12-month review hearing.  This argument ignores father's failure to make progress in his individual counseling or couples therapy during the last review period.  Besides, section 366.22, subdivision (a) requires more than mere attendance in classes or therapy sessions.  (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142 ["Availing [oneself] of the services provided is one consideration under section 366.22, subdivision (a), but under this statute the court must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of home"].)  Father's scoffing during his domestic

13

violence classes and refusal to engage in self-reflection during his group therapy sessions indicate that father did not meaningfully participate in the classes he attended. Likewise, father's inability to tell the social worker about any connections between his therapy or classes and his life reflects a lack of insight inconsistent with progress in his counseling. Father cannot blame the Bureau for his failure to fully participate and make substantive progress in his case plan.

Father also attempts to rebut the finding of detriment by citing several pieces of contrary evidence. He asserts the psychologist said that father was learning to acknowledge his temper. He also cites his testimony at the hearing that he was calmer because he and mother were no longer a couple and that there were plans for mother to move out of the home. Finally, he notes that the minor stated at the beginning of the case that the minor was not afraid of father and father's anger was not directed at the minor.

This argument implicitly asks this court to weigh the evidence he cites against the evidence supporting the juvenile court's findings. This we cannot do. The juvenile court's findings must be affirmed so long as substantial evidence supports them, even if other evidence might support a contrary conclusion. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.) Father's contrary evidence therefore is legally insufficient to warrant reversal of the juvenile court's findings.

Moreover, the evidence father cites does not significantly affect the overall state of the record. The minor's beliefs at the beginning of the case several years earlier have little bearing given the additional evidence that accumulated by the 18-month hearing after disposition. It is helpful that father had begun acknowledging his temper. But this

is not sufficient to require the return of the minor, because father still had not acknowledged how his temper in the past had led to domestic violence. Father's testimony also did not address mother's accusations of rape. Mother attempted to retract those accusations by saying father merely had sex with her when she did not want to have sex at the moment, but the juvenile court reasonably viewed this as confirming the accusation. Finally, even accepting at face value the testimony that father's relationship with mother had ended and that mother intended to move out of the house, at the time of the hearing the two were still living together and mother had no specific plan to leave. Given these circumstances, the juvenile court could reasonably credit the psychologist's assessment that father's domestic violence would likely continue because he still lacked insight into his actions.

### B. Reasonable services

Subject to exceptions not applicable here, if a child is not returned to a parent at the 18-month hearing, the court must terminate services and set a selection and implementation hearing under section 366.26 to determine the appropriate plan for the child. (§ 366.22, subd. (a)(3).) The court must also determine, using a preponderance of the evidence standard, whether reasonable services have been offered or provided to the parent. (*Ibid.*; *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 590.) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in

15

areas where compliance proved difficult.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001, italics omitted.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) " '[R]eunification services are voluntary . . . and an unwilling or indifferent parent cannot be forced to comply with them.' " (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1365.)

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

### 1. Father

The problems that led to the minor's removal from father were his inability at times to regulate his aggressive emotional outbursts and to understand the impact of these outbursts, his acts of domestic violence toward and rape of mother, and his failure to ensure the minor followed proper hygiene and received treatment for an autism-related condition. To address these issues in the final review period, the Bureau provided father a parent partner, continued the domestic violence/anger management services father had been receiving since the beginning of the case, and held two Children and Family Team meetings. The Bureau also followed up to confirm father had completed a group therapy program designed to give him tools to change his behavior in response to stress. The Bureau continued its efforts to secure individual counseling for father, and father was able to

16

schedule and participate in five individual counseling sessions. The Bureau also secured couples counseling for both parents.

Father does not dispute that these services were properly designed to remedy the problems the Bureau identified. Instead, he first argues the juvenile court should have extended his services because it previously found at the 12-month hearing that the Bureau failed to provide reasonable services. Father cites several cases that held that a failure to provide reasonable services required the extension of services beyond the 18-month review period. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 663, 675, 678 [no reasonable services during combined six-, 12-, and 18-month review]; *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1252, fn. 12, 1255–1256 [12-month review]; *In re Alvin R., supra*, 108 Cal.App.4th at pp. 970, 973–975 [six-month review].) None of these cases involved a situation like the one here, where a court found a failure to provide reasonable services at an interim review and then terminated services after a social services agency offered an additional period of services. "The remedy for the failure to provide court-ordered reunification services to a parent is to provide an additional period of reunification services to that parent and to make a finding on the record that reasonable services were not offered or provided to that parent." (*In re A.G., supra*, 12 Cal.App.5th at p. 1005, italics omitted; *T.J. v. Superior Court*, at p. 1251.) The juvenile court provided this remedy by making the required finding and ordering additional services during the 18-month review period.

The services provided to father during the 18-month review period corrected the deficiencies in the services from the prior period. The juvenile court's finding of no reasonable services at the combined

six- and 12-month review hearing was based on the absence of individual therapy sessions, which in turn was due to the pandemic and shelter-in-place orders, difficulties with father's health insurance, and waiting lists for services. The juvenile court was apparently also concerned about the billing difficulties that had interrupted father's domestic violence classes. The juvenile court ordered the Bureau to assist father with getting into therapy immediately and to avoid further billing issues. The Bureau complied with these orders by the 18-month hearing, since father had attended five sessions of individual therapy and resumed his domestic violence classes. Father had also already completed a 12-week program of behavioral therapy to help him deal with stress, which was the same ground he was covering with his therapist. In these circumstances, the Bureau's failure to provide reasonable services during the combined six- and 12-month period did not require the extension of services beyond the 18-month period.

Besides relying on the juvenile court's finding of no reasonable services at the combined six- and 12-month review hearing, father also argues his services in the 18-month review period were not reasonable because the Bureau failed to provide him a treatment plan recommended by the psychologist who evaluated him. Father contends the Bureau was obligated under *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397 to provide him services tailored to his mental illness. That case held that a parent's failure to take medication to treat her mental illness should have been the starting point for tailoring reunification services. (*Id.* at pp. 420, 422.) This case is inapposite because father's argument rests on a misreading of the record. The psychologist's evaluation of father stated that it would be

18

useful for father's treatment planning and growth to acknowledge his temper and what provokes it. This statement does not mean the psychologist had prepared a treatment plan that the Bureau failed to implement. Rather, it indicates merely that father would not benefit from any treatment given his inability to recognize that he needed the treatment at all. Father also cites nothing to support his contention that he had a mental illness. The psychologist's report did not state that father suffered from mental illness; rather, it said that father's obstacle to making progress with his services was his denial of his behavior. Father does not identify any service the Bureau could have offered that would have overcome this attitude.

## 2. Mother

The Bureau removed the minor from mother's custody because her medical condition made her unable to care for the minor and she was physically and psychologically unable to protect herself from father's domestic violence. To address these issues in the final review period, the Bureau provided mother a parent partner, continued mother's domestic violence counseling, secured couples counseling, and held two Children and Family Team meetings.

Mother contends these services were inadequate because the Bureau did not comply with the juvenile court's orders at the combined six- and 12-month review hearing. The juvenile court had ordered the Bureau to hold a Children and Family Team meeting and to explore creative opportunities related to what services would be best for mother if she were to continue living in the home. Mother notes that creative solutions that would allow mother to remain in the home were important because the Bureau believed the negative family dynamic

had not changed and the Bureau had faulted mother for failing to leave the home. The outcome of the first Children and Family Team meeting was the provision of couples counseling. Mother characterizes this as lacking creativity and comprehensiveness. She argues she should instead have been referred back to a public health nurse for further services, assisted in re-engaging or increasing in-home support services from someone other than father, and assisted in obtaining the records necessary to prove her eligibility for Regional Center services, or referred to a disability rights advocate.

Mother's arguments demonstrate the same inconsistency that mother herself did over the course of the case. The court's order regarding creative solutions at the 12-month hearing was apparently based on mother's statement at that hearing that she wanted to remain in the home. Similarly, mother's arguments here regarding the need for in-home supportive services and a public health nurse to alleviate stress in mother's and father's relationship assume mother would remain in a relationship with father. But during the last review period, mother denied ever saying that she wanted to remain in a relationship with father and insisted instead that she wanted to leave the house. Mother's changing desires placed the Bureau in a difficult position: if it followed the juvenile court's orders from the hearing, mother could argue it failed to take into account her new desires, while if it followed those desires, mother could fault the Bureau, as she now does, for failing to follow the juvenile court's orders.

In these circumstances, the Bureau reasonably decided that couples counseling was a creative solution that would help mother remain in the home, if she decided that was her goal. The Bureau also

20

offered other services to meet mother's desire at the time of leaving the home. In one meeting with mother during the final review period, the social worker offered to assist mother on the spot with calling her physician to begin a referral to enter a skilled nursing facility. Mother did not accept the offer. Mother later refused to communicate with the social worker. The social worker also noted that mother made no movement toward leaving the home after a domestic violence counselor told mother she should enter a skilled nursing facility. These services were reasonable under the circumstances. (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5 [there is no "requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions"].)

Mother's position that the social worker should have assisted mother in establishing her eligibility for Regional Center services assumes without evidence that mother was eligible. The social worker tried for almost two years to secure the necessary documentation, including by asking the maternal grandmother for information, but without success. To demonstrate the social worker's attempts were unreasonable, mother must point to some evidence to suggest that a reasonable effort had a chance of success. She has not done this, so we must infer from the record that mother was ineligible.

Like father, mother also faults the Bureau for failing to assess her for any cognitive issues, noting that the Bureau described mother at the beginning of the case as presenting with mental and/or developmental disabilities, the court appointed her a guardian ad litem, and the couples therapist expressed concerns about mother's and father's cognitive functions. Mother's functioning changed fairly

dramatically during the case, evolving at one point over the course of several days from an inability to communicate with more than a few words and head gestures to the expression of complete thoughts in full sentences. During the final review period in particular, mother had no difficulty communicating or explaining her desires to social workers and her guardian ad litem. She also testified clearly at the 18-month review hearing. The therapist did express concerns about mother's cognitive function, but the therapist also admitted it was difficult to tell the difference between her impaired functioning and her manipulative tactics of claiming not to know or remember things. Mother also ignores the fact that she was diagnosed as having conversion disorder, epilepsy, and post-partum depression. Mother does not acknowledge these diagnoses, explain why they were insufficient to explain her behavior, or demonstrate why the Bureau should have decided mother required further assessment. These facts are therefore different from *Patricia W. v. Superior Court*, *supra*, 244 Cal.App.4th at page 401, where a child was removed from her parents' custody because the mother ran out of medication and had relapsed into schizophrenic episodes that involved violent hallucinations of harming and killing their child. *Patricia W.* held that in such circumstances, the social services agency was obligated to offer services to address the mother's difficulty remaining medicated. (*Id.* at p. 422.) There is no indication here that mother suffered from an undiagnosed condition or that the Bureau could have improved mother's use of services through the straightforward step of helping her take medication.

## C. Visitation

Even when a court terminates services at an 18-month review hearing and sets a hearing under section 366.26 to determine the permanent plan for a child, the court "shall continue to permit the parent or legal guardian to visit the child unless it finds that visitation would be detrimental to the child." (§ 366.22, subd. (a)(3).)  On appeal, we review a juvenile court's visitation order for abuse of discretion.  (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)

The parents contend the juvenile court abused its discretion in reducing visitation from two hours per month to one hour per month.  They point out that the juvenile court did not explain the basis for the reduction in visitation.  They also note that evidence in the record regarding the visits during the last review period was largely positive, with the parents behaving appropriately and both the minor and parents enjoying the visits.

The Bureau defends the juvenile court's order by noting that the minor had become ambivalent towards visitation with the parents.  This does not demonstrate that continuing the prior level of visitation would have been detrimental to the minor.  The minor's ambivalence about visitation related to the need to wear masks and adhere to social distancing requirements during in-person visits because of the COVID-19 pandemic.  The minor had also recently stopped asking for calls or video chats with the parents in addition to the regular visits.  However, the minor continued to express a desire to remain in contact with the parents.  Thus, the record falls short of demonstrating that the minor was opposed to visits.  Moreover, even if the minor were ambivalent,

that would not constitute evidence that continued visitation for two hours per month would be detrimental to the minor.

The Bureau also notes that the juvenile court had terminated reunification services and set a section 366.26 hearing, apparently implying that visitation was detrimental because of the impending hearing at which mother's and father's parental rights might be terminated. The mere termination of services is not a basis to reduce or eliminate visitation. The Board's argument to the contrary ignores the statutory presumption that visitation must continue even when reunification services are terminated unless such visits would be detrimental. (§ 366.22, subd. (a)(3).) Additionally, "[m]eaningful visitation is pivotal to the parent-child relationship, even after reunification services are terminated," because only with visitation can a parent hope to satisfy the statutory exception to termination of parental rights in section 366.26, subdivision (c)(1)(B)(i) for a parent who has a beneficial parent relationship with a child. (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504–1505.)

Because there is no evidence in the record to support a finding that visitation at the prior level would be detrimental to the minor, we conclude the juvenile court abused its discretion in reducing visitation for the parents to one hour per month. We will therefore direct the juvenile court to vacate its visitation order and continue the prior level of visitation unless it finds such visitation would be detrimental to the minor.

## D. Bonding study

In their final argument, the parents argue the juvenile court erred by denying their motions for a bonding study. Evidence Code

section 730 empowers a juvenile court to appoint a fact-finding expert witness to study the bond between a parent and child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) Such a bonding study analyzes the strength and nature of the relationship between the parent and child, which can be relevant at a hearing under section 366.26 to the question of whether the beneficial parent-child relationship exception to termination of parental rights in section 366.26, subdivision (c)(1)(B)(i) applies. (Abbott et al., Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2020) § 8.33.) A bonding study can be particularly helpful when there is "a need for a more objective, third party analysis to assist in determining the extent to which a parental relationship does exist, and in determining (to the extent possible) the detriment to the child if the relationship with the parent is severed by a termination of parental rights." (*Ibid.*) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) When reviewing the denial of a request for a bonding study, "[t]he applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.)

The juvenile court denied mother's and father's motions for a bonding study in part because it was concerned a study could be intrusive or involved for the minor. Mother points out that there was no evidence regarding what a bonding study would entail, so the juvenile court's concerns about a study being intrusive or detrimental to the minor are speculative. This is true. However, given that the

25

parents were requesting the bonding study and therefore had the burden of proof, the absence of evidence in the record regarding the nature of the proposed bonding study weighs against their request, not for it.

In any event, even if the juvenile court's concerns about detriment were speculative, the juvenile court also denied the parents' motion because it believed the record already presented an in-depth description of the visits between the minor and the parents. Father attacks this conclusion by contending the record of the visits between the minor and parents was insufficient because the Bureau was not neutral on the issue of termination of parental rights. As proof of bias, father points to the Bureau's admission that it discussed adoption with the minor before the hearing and told the minor that adoption would not mean severing contact with the parents.

Even assuming that these discussions with the minor tipped the Bureau's hand regarding its position on adoption, that position does not appear to have skewed the Bureau's descriptions in its reports of the visits between the minor and the parents. Those reports are almost uniformly positive. The social workers' reports noted that the parents consistently visited with the minor and described father as having a loving bond with the minor and encouraging the minor to engage with mother, despite mother's difficulties with mobility and communication. The juvenile court therefore did not abuse its discretion by rejecting the claim that a bonding study was needed because of the Bureau's bias.

Mother contends the Bureau's descriptions of the numerous visits between the minor and the parents were inadequate to determine the minor's relationship with the parents. She notes that the reports were

26

written by several different social workers and maintains the descriptions of the visits, while positive, are insufficiently detailed. The concurrence of several different social workers regarding the positive nature of the parents' numerous visits serves only to support the parents' position, not undercut it. Also, while mother is correct that some visit descriptions are less detailed than others, the record as a whole is extensive, describing visitation throughout the two and a half years after the Bureau filed its first petition. The juvenile court was well aware of this record, as demonstrated by the court's remarks in its findings at the 18-month review hearing regarding the minor's bond with the parents, particularly father.

Mother further contends that the nature and importance of her bond with the minor is difficult to assess from the record of visits because her medical issues limited her communication and participation in visits and because both parents visited the minor together. The social workers did describe how mother's medical condition affected her visits with the minor, especially in contrast to father's more active role in the visits, but these facts are relevant evidence as to the nature of the minor's bond with mother. The record is not inadequate simply because it does not favor mother's position. A bonding study is also not necessary merely because mother's communication and mobility had improved by the 18-month review hearing. "The kind of parent-child bond the court may rely on to avoid termination of parental rights under the exception provided in section 366.26, subdivision [(c)(1)(B)(i)] does not arise in the short period between the termination of services and the section 366.26 hearing. 'The exception applies only where the court finds regular visits and

contact have continued or developed a significant, positive, emotional attachment from child to parent. [¶] At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent.' " (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196.)

Finally, the parents note that the minor had been diagnosed with an autism spectrum disorder and argue this disorder's impact on the relationship between the minor and the parents was worthy of expert analysis. This diagnosis perhaps could have justified the juvenile court in granting the request for a bonding study. But we cannot say that such a diagnosis necessarily means the juvenile court erred by denying the request. If the parents believed the minor's autism spectrum disorder prevented the Bureau from accurately assessing the nature of the family visits, the parents should have requested a bonding study long before the 18-month review hearing.

A court considering whether to obtain a bonding study is not operating in a vacuum, especially when the request comes at the conclusion of the 18-month review hearing in preparation for a selection and implementation hearing under section 366.26. Bonding studies take time, usually requiring continuance of the section 366.26 hearing. (*In re Richard C., supra,* 68 Cal.App.4th at p. 1197 ["Bonding studies after the termination of reunification services would frequently require delays in permanency planning"]; Abbott et al., Cal. Juvenile Dependency Practice, *supra,* § 8.33.) Even if bonding studies were required only when children have mental health diagnoses like the minor here, such requests could be made in many dependency cases,

delaying permanency for children in need of stability. "While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*In re Richard C.*, at p. 1197.) We thus conclude the court did not abuse its discretion in denying the parents' request for a bonding study.

## III.   DISPOSITION

The writ petitions are granted in part. Let an extraordinary writ issue directing the juvenile court to vacate its order setting visitation for mother and father at one hour, one time per month. The court shall re-examine the issue of visitation and continue to permit mother and father to visit the minor for one hour, two times per month unless it finds that such visitation would be detrimental to the minor. In all other respects, the writ petitions are denied. The requests for a stay of the April 7, 2021 hearing are denied as moot. This decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

BROWN, J.

WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.

*L.B. v. Contra Costa County Superior Court* (A161673)

29